**In re WASHINGTON PUBLIC POWER SUPPLY SYSTEM SECURITIES LITIGATION.**

**MDL No. 551.**

United States District Court, D. Arizona.

Sept. 5, 1989.

See also, 823 F.2d 1349.

Paul M. Bernstein, Bernstein, Litowitz, Berger & Grossmann, Melvyn I. Weiss, Milberg, Weiss, Bershad, Specthrie & Lerach, New York City, James R. Irwin, Shidler, McBroom, Gates & Lucas, Seattle, Wash., Michael J. Meehan, Molloy, Jones & Donahue, Tucson, Ariz., for class plaintiffs.

Richard W. Clary, Cravath, Swaine & Moore, New York City, Michael Mines, Betts, Patterson & Mines, Seattle, Wash., H. Michael Clyde, Brown & Bain, Phoenix, Ariz., Harold R. Tyler, Jr., Patterson, Belknap, Webb & Tyler, New York City, for Chemical Bank.

Albert R. Malanca, Gordon, Thomas, Honeywell, Malanca Peterson & Daheim, Tacoma, Wash., for Washington Public Utilities Group and Certain Individuals.

Edwin J. Wheeler, Wheeler & Huss, Tacoma, Wash., for Town of Steilacoom, Wash.

James P. McNally, Ione, Wash., for Pend Oreille.

Richard A. Nelle, Blaine, Wash., for City of Blaine, Wash.

Jacob L. Smith, Smith & Rosellini, Lynden, Wash., for City of Sumas, Wash.

Edward B. O'Connor, O'Connor, Ludwigson, Thompson & Hayes, Bellingham, Wash., for Orcas Power & Light Co.

David F. Jurca, Helsell, Fetterman, Martin, Todd & Hokanson, Seattle, Wash., for Columbia defendants and Certain Individuals.

R.L. Marceau, Johnson, Marceau, Karnopp & Peterson, Bend, Or., for Central Elec. Co-op, Inc.

Dennis K. Bromley, Pillsbury, Madison & Sutro, San Francisco, Cal., for Snohomish Group.

Robert D. Stewart, Culp, Guterson & Grader, Seattle, Wash., Daniel R. Murdock, Donovan, Leisure, Newton & Irvine, New York City, for Washington Public Power Supply System.

Ralph K. Nickerson, Goldendale, Wash., for PUD # 1 of Klickitat County, Wash.

Larry S. Ganges, Lane, Powell, Moss & Miller, Seattle, Wash., Rockne Gill, Schwabe, Williamson, Wyatt, Moore & Roberts, Portland, Or., for Oregon Public Entities and Certain Individuals.

Ronald E. Bailey, R. Erick Johnson, Bullivant, Houser, Bailey, Pendergrass & Hoffman, Portland, Or., for Cities of McMinnville and Drain, or and Certain Individual.

Peter R. Mersereau, Rankin, VavRosky, Doherty, MacColl & Mersereau, Portland, Or., for Cities of Springfield & Milton-Freewater, Or.

Dwight A. Halstead, Prosser, Wash., for Benton Rural Elec. Ass'n.

Everett B. Clary, O'Melveny & Myers, Los Angeles, Cal., for Certain Individual Director defendants.

G. Edward Fitzgerald, Gibson, Dunn & Crutcher, Los Angeles, Cal., Michelle Coyle, Gibson, Dunn & Crutcher, Seattle, Wash., for Certain Participants' Committee Members.

John D. Lowery, Riddell, Williams, Bullitt & Walkinshaw, Seattle, Wash., for Small Utilities Group.

Herbert Gelman, Gelman, Courture & Pate, Tacoma, Wash., for Alder Mut. Light Co.

Malcolm S. Harris, Harris, Orr & Kinzer, Seattle, Wash., for PUDs No. 1 of Ferry & Kittitas Counties and Certain Individuals.

Camden M. Hall, Foster, Pepper & Shefelman, Seattle, Wash., for City of Seattle.

Joyce Cresswell, Civil Div., U.S. Dept. of Justice, Portland, Or., and J. Christopher Kohn, Director, Commercial Litigation Branch, U.S. Dept. of Justice, Washington, D.C., for U.S.–Bonneville Power Admin.

David A. Bennett, Bennett & Bigelow, Seattle, Wash., for Wood & Dawson.

Otto G. Klein, Heller, Ehrman, White & McAuliffe, Seattle, Wash., for Ebasco Services Inc.

Ralph G. Wellington, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., John F. Kruger, Karr, Tuttle Campbell, Seattle, Wash., for United Engineers & Contractors, Inc.

Peter J. Nickles, Covington & Burling, Washington, D.C., for Ebasco Services Inc.

Roy J. Moceri, Reed, McClure, Moceri, Thonn & Moriarty, Seattle, Wash., for R.W. Beck & Associates.

James J. Hagan, Simpson Thacher & Bartlett, New York City, Jerry Edmonds, Margaret A. Sundberg, Williams, Kastner & Gibbs, Seattle, Wash., Thomas Chandler, Dan Cavett, Chandler, Tullar, Udall & Redhair, Tucson, Ariz., for Blyth Eastman Paine Webber Inc.

### OPINION AND ORDER

WILLIAM D. BROWNING, District Judge.

The parties to this action seek the Court's approval of settlement agreements entered into by Class Plaintiffs, Chemical Bank as Trustee and attorney-in-fact for Bondholders, and all defendants remaining in the MDL 551 (All Cases) Class Action litigation ("MDL 551" or "MDL"). In addition, the parties to the Western District of Washington Class Action entitled *Mirotznik v. Ernst & Whinney*, CV No. C85–1105, which was consolidated with the MDL 551 Class Action for purposes of settlement, also seek approval of a settlement arrived at in that action. Rule 23(e), Federal Rules of Civil Procedure, requires this Court's approval of the settlements of these class actions before they may become effective. Such a requirement does not exist in connection with the settlement of most private civil actions. For reasons that will become evident, after thorough deliberation of the exceptionally complex and difficult issues related to these settlement agreements, the Court approves the settlements of these actions and all relevant agreements.

## CONTENTS OF THIS OPINION

Background of the Litigation ............................................. 1384

Standards for Approval of Settlements ...................................... 1387

Application of the Standards to All Settlements Herein ....................... 1388
 The Strength of Plaintiffs' Case ....................................... 1388
 The Risk, Expense, Complexity, and Likely Duration of Further Litigation 1390
 The Amount Offered in Settlement ...................................... 1390
 The Relationship of the Settlement Amount with the Likelihood of Success and
 Potential Range of Recovery at Trial ................................ 1391
 The Extent of Discovery Completed and the Stage of Proceedings .......... 1392
 The Experience and Views of Counsel ................................... 1392
 The Reaction of Class Members to the Proposed Settlement ............... 1392
Analysis of Individual Settlements .......................................... 1395
 The City of Seattle ................................................... 1395
 Ferry and Kittitas .................................................... 1395
 Oregon Public Entities ............................................... 1396
 Small Utilities ...................................................... 1396
 Unaffiliated Participants ............................................. 1397
 Mid–Columbia Defendants ............................................. 1397
 Columbia Defendants ................................................. 1398
 Wood Dawson Smith & Hellman ........................................ 1398
 Washington Public Power Supply System ............................... 1401
 R.W. Beck and Associates ............................................ 1403
 Central Electric Cooperative, Inc. .................................... 1404
 Clallam County Public Utility District No. 1 .......................... 1404
 City of Richland .................................................... 1405
 The Individual Defendants ............................................ 1406
 The Consolidated Settlement—WPUG, Franklin, Klickitat, Mason, Steilacoom,
 Alder, BPA, and State of Washington ............................... 1406
 Severability ...................................................... 1407
 Washington Public Utilities Group ................................. 1408
 Franklin .......................................................... 1409
 Klickitat ......................................................... 1409
 Bonneville Power Administration ................................... 1409
 The State of Washington ........................................... 1412

**1384**

Snohomish County ............................................... 1417
United and Ebasco ............................................. 1418
Blyth Eastman ................................................. 1419

Ernst & Whinney ................................................... 1419

Objections of Post–June 15, 1983 Bond Purchasers .......................... 1420

---

## BACKGROUND OF THE LITIGATION

It is neither possible nor desirable to attempt to capture in this Order the complete history of this massive litigation. The docket alone contains almost 4000 entries. The litigation has been complex and the Court is aware of a number of misunderstandings concerning the nature and scope of the action that have arisen or have been revealed as a result of these settlement agreements. In an effort to clarify just what this litigation did and did not involve, the following historic overview is presented.

### Related Litigation

In 1976 the Washington Public Power Supply System ("WPPSS," "the Supply System," or "the System") entered into agreements with eighty-eight public utilities in the Northwest ("Participants' Agreement"), under which each participant utility purchased a percentage of the "project capability" of two nuclear power projects ("Projects 4/5") and agreed to pay its percentage share of costs incurred by the Supply System to finance, construct and operate those Projects. During the next five years, the Supply System issued $2.25 billion in bonds to finance Projects 4/5. On January 22, 1982, prior to their completion, construction of the Projects was terminated. Terms of the Participants' Agreement would have obligated the Participants to commence payments to the Supply System one year later.

Within months of termination, however, various lawsuits were filed by ratepayers, certain utilities and Chemical Bank in its capacity as Trustee for Project 4/5 Bond-holders. On June 15, 1983 the Washington Supreme Court decided that certain municipal utilities had lacked authority to enter the Participants' Agreement. *Chemical Bank v. Washington Public Power Supply System*, 99 Wash.2d 772, 666 P.2d 329 (1983), *aff'd on rehearing*, 102 Wash.2d 874, 691 P.2d 524 (1984). On remand to the state Superior Court, the Participants' Agreements, which had unconditionally obligated the participating utilities to make payments to cover the costs of the projects, whether or not they were completed, operable or operating, were invalidated and rendered unenforceable. The decision was unsuccessfully appealed by Chemical Bank. A second decision of the Washington Supreme Court on November 6, 1984, *Chemical Bank v. Washington Public Power Supply System*, 102 Wash.2d 874, 691 P.2d 524 (1984), *cert. denied*, 471 U.S. 1065, 105 S.Ct. 2140, 85 L.Ed.2d 497 (1985), released the remaining public utilities in the Pacific Northwest from the Participants' Agreements. The United States Supreme Court denied the Bond Fund Trustee's petition for certiorari and declined to review the Washington courts' decisions.

Early in 1983, numerous Class Action suits alleging securities law violations in connection with the sale of the WPPSS 4/5 bonds were filed in the Western District of Washington and the Southern District of New York. Later that year Chemical Bank undertook similar litigation on behalf of Bondholders. The actions were consolidated by the Panel on Multidistrict Litigation in August 1983 and transferred to the Western District of Washington. Ultimately, twenty-nine separate actions were consolidated under the MDL 551 caption.[1]

---

1. Several have been dismissed or transferred. Consolidated cases that remain are: *Mirotznik v. WPPSS* (C83–295); *Massry v. WPPSS* (C83–296); *Bonseigneur v. PUD No. 1, Benton County* (C83–299); *Harris v. Blyth Eastman* (C83–300); *Puchall v. WPPSS* (C83–305); *Sheldon v. Blyth Eastman* (C83–307); *Schroeder v. WPPSS* (C83–359); *Laub v. Wood and Dawson* (C83–370); *Stepak v. WPPSS* (C83–1041); *Fruchter v. WPPSS* (C83–1066); *Chemical Bank v. PUD No. 1 of Benton County* (C83–1080); *Bonseigneur v. R.W. Beck* (C83–1111); *Zucker v. WPPSS* (C83–1112); *Woolin v. WPPSS* (C83–1118); *766 Broadway Corp. v. WPPSS* (C83–1216); *The Doctors Co. v. WPPSS* (C83–1233); *Sigmund v. WPPSS* (C83–1249); *Pine v. Chemical Bank* (C83–1251); *M.G.*

*The Plaintiffs*

Initially the class action complaints were brought on behalf of purchasers of WPPSS Project 4/5 bonds from March 1, 1977 through January 22, 1982. The complaint was later amended to include persons and entities that had purchased bonds from January 23, 1982 through June 15, 1983. These two groups of purchasers (excluding defendants in this action and related persons and entities) were later certified under Fed.R.Civ.P. 23, as the Pre–Termination and Post–Termination Classes, respectively.[2] Proof-of-Claim procedures were employed to identify membership in the Classes. Persons or entities whose 4/5 bond purchases place them within either of the Classes are referred to herein as Class Members or Class Plaintiffs. They are Class Members regardless of whether they continue to hold bonds purchased during either of the Class periods, although some Class Members were permitted to "opt out" or exclude themselves from the Classes.[3] The term "Bondholders" refers to persons or entities who, at a given time, hold a WPPSS Project 4/5 bond. Bondholders who purchased bonds during the Class periods, unless they opted out or are excluded because they are defendants or are related to defendants, are also Class Members.

*This Litigation*

This has been one of the most complex lawsuits in the history of securities litigation. Discovery and other pre-trial proceedings were extraordinarily large and sophisticated. Special Masters and protocols were utilized extensively. Courtroom facilities were specially prepared for the trial, which began in September 1988, and was suspended several months later when the last of these settlement agreements was consummated. A seventeen-member jury heard opening arguments and listened to the testimony of a single witness during that time period.

This Court has *not* had before it claims related to the enforceability of the Participants Agreements. Those issues were decided in the Washington state court litigation in 1983 and 1984. Because it lacks jurisdiction, this Court is powerless to nullify, change or modify the state courts' decisions that invalidated the Agreements. The claims litigated before this Court have focused, almost exclusively, on allegations of material misrepresentations or omissions in connection with the issuance of Official Statements associated with the offer and sale of Bonds to finance the construction of the WPPSS 4/5 nuclear generating Projects. The settlement agreements that are the subject of this Order likewise concern the resolution of those allegations, *not* contractual or debt claims.

The operative Class Complaint in this case alleges violations of federal securities laws, Washington state statutory law and the common law in connection with the offer and sale of WPPSS Project 4/5 Bonds. The operative Chemical Bank Complaint asserts securities fraud, negligence and other claims under state and federal law, as well as breach of contract claims on behalf of all Bondholders.

---

*I.C. v. PUD No. 1, Benton County* (renamed *AMBAC v. PUD No. 1, Benton County*) (C84–690); *Mirotznik v. Love* (C85–105); *Chiert v. WPPSS* (C86–478); and *Baker v. Merrill Lynch, Pierce, Fenner and Smith, Inc.* (C86–003).

2. The word "termination" as used to define these classes refers to the cessation of construction of the WPPSS 4/5 Projects, January 22, 1982. The close of the Post–Termination Class, June 15, 1983, marks the date the Washington State Supreme Court rendered its decision invalidating the Participants' Agreements. Those events, which reflect the availability of information relevant to the misrepresentations and omissions alleged in this action, also influenced the measure of damages potentially available.

3. If persons or entities have excluded themselves from the Pre–Termination Class, but are members of and have not excluded themselves from the Post–Termination Class, they are deemed to be Class Members for purposes of claims which arise from their membership in the Post–Termination (but not the Pre–Termination) Class. If persons or entities have excluded themselves from the Post–Termination Class, but are members of and have not excluded themselves from the Pre–Termination Class, they are deemed to be Class Members for purposes of claims which arise from their membership in the Pre–Termination (but not the Post–Termination) Class.

The complaints name a multitude of defendants. Class Plaintiffs sued the Supply System; its Directors; the nineteen public utilities and four cities that comprised the twenty-three member Supply System; the sixty-eight Project 4/5 Participants that were not members of the System; the individual and alternate members of the Participants Committee; Blyth Eastman Paine Webber, financial consultant to the System; R.W. Beck and Associates, consulting engineers to the System; United Engineers and Constructors, and Ebasco Services Incorporated, architect/engineers for Projects 4/5; Wood Dawson Smith Hellman, bond counsel; Houghton Cluck Coughlin & Riley, special counsel to the Supply System; Merrill Lynch, Pierce, Fenner & Smith Incorporated, Salomon Brothers Inc., Smith Barney Harris Upham & Co., Incorporated and Prudential–Bache Securities Inc., bond underwriters; Moody's Investors Service and Standard & Poor's Corporation, securities rating agencies; and the Bonneville Power Administration ("BPA").

The Chemical Bank complaint named the Supply System; its directors; the twenty-three member utilities; the eighty-eight Project 4/5 Participant utilities, some of which were also members of the Supply System; 4/5 Participants Committee members; and BPA. The "professional" defendants named in the Class complaint were not sued by Chemical Bank in this action.

*These Settlements*

The terms of these settlements appear in documents containing the provisions of agreements Plaintiffs arrived at over a period of approximately eight months with various groups of defendants or individual entities. The majority of settlements occurred prior to the start of trial, September 7, 1988. The remainder were reached in the two and one-half months that followed, during which the trial progressed. Each final settlement agreement is generally entitled "Stipulation and Agreement of Compromise and Settlement." In order to expedite the stay and severance of defen-

dants from further proceedings at the time settlement was achieved, these final agreements were normally preceded by memoranda of understanding containing abbreviated terms of the parties' agreements. The jury was dismissed and the trial terminated on January 9, 1989, after the final settlement was announced.

The terms of these settlements require payment, into a Settlement Fund, of more than $580 million before any interest. Four settlement agreements in this action involving payments of nearly $107 million were previously approved by this Court.[4]

Notice of these settlements and of Settlement Hearings to be held to determine whether the proposed settlements are fair, reasonable and adequate was provided, pursuant to this Court's Order dated February 6, 1989, to Class Members through an extensive mail and publication program in accordance with Rule 23. That Class Notice was sent to all known 4/5 Bondholders, as well. Chemical Bank also undertook to notify known Bondholders of the settlements in a separate Notice. Class Members were informed in the Class Notice of their opportunity to object to the terms of the settlements and Bondholders were also informed that they would be given the opportunity to express objections at the hearings, whether or not they were also Class Members.

The Class Notice and the Chemical Bank Notice also informed recipients that matters dealing with the allocation of settlement proceeds would be dealt with by the Court in the future. Accordingly, following the rendition of this Order, a hearing will be set to determine a number of issues surrounding the allocation and distribution of the Settlement Fund. Issues that will be considered in connection with that hearing include matters related to the allocation of funds between Pre–Termination and Post–Termination Class Members and to the Bond Fund for the benefit of Bondholders.

---

**4.** *See* Orders of June 24, 1988 approving settlement with Inland Utility defendants ($6,750,-000) and Underwriter defendants ($92,000,000); Order of July 28, 1988 approving settlement with Houghton Cluck Coughlin & Riley ($7,250,-

000); and Order of June 30, 1988 approving settlement of the action entitled *Mirotznick v. Sensney, Davis & McCormick, et al.,* CV No. C85–1076, consolidated for settlement purposes with MDL 551 ($820,000).

The Court currently has under advisement requests for an award of attorneys' fees out of the Settlement Fund for Class Plaintiffs' counsel, and for reimbursement of expenses, including more than $51.4 million that was advanced by the Bond Fund for Plaintiffs' litigation expenses. Those issues will not be considered at the allocation hearing. Chemical Bank has advised the Court that it will not seek attorneys' fees out of the Settlement Fund. Neither the fee and expense petitions nor matters related to the allocation and distribution of settlement funds will be addressed in this Opinion and Order.

Settlement Hearings were held at the United States Courthouse in Seattle, Washington on April 11, 1989. The Court heard from all persons who wished to speak. In addition, papers in support of and in opposition to the settlements were submitted to the Court in accordance with terms of the Class Notice. The Court also received more than 400 letters from individuals. The Court has considered the arguments, objections and comments contained in all of those submissions as well as those made at the hearings.

## STANDARDS FOR APPROVAL OF SETTLEMENTS

■ The Court's primary concern is whether a settlement, taken as a whole, is fundamentally fair, adequate and reasonable to all concerned. *Officers for Justice v. Civil Service Commission*, 688 F.2d 615, 625 (9th Cir.1982), *cert. denied*, 459 U.S. 1217, 103 S.Ct. 1219, 75 L.Ed.2d 456 (1983). The Court's approval is necessary to ensure that Class Members' rights have been given due regard and adequate protection by the negotiating parties. It recognizes, however, that the essence of settlement is compromise. Compromise involves the moderation of lofty and idealized hopes and the relinquishment of unyielding and absolute positions. *Officers for Justice*, 688 F.2d at 624; *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir.1977).

■ The law favors settlement. It is indeed the preferred means of dispute resolution, particularly in complex class action litigation such as this. Voluntary resolution is in the public interest, *Officers for Justice*, 688 F.2d at 625, *Van Bronkhorst v. Safeco Corp.*, 529 F.2d 943, 950 (9th Cir.1976), *Nelson v. Bennett*, 662 F.Supp. 1324, 1334 (E.D.Cal.1987), and the Court must determine whether the interests of the Classes will be better served by resolution of the litigation than by continuation of it.

■ The Court must and will consider many things in assessing the fairness, reasonableness and adequacy of these settlements. They include some or all of the following:
—the strength of plaintiffs' case
—the risk, expense, complexity, and likely duration of further litigation
—the amount offered in settlement
—the relationship of the settlement amount with the likelihood of success and potential range of recovery at trial
—defendant's ability to pay a judgment larger than the amount provided by the proposed settlement
—The extent of discovery completed and the stage of proceedings
—the experience and views of counsel
—the reaction of class members to the proposed settlement.

*See Officers for Justice*, 688 F.2d at 625; *Marshall v. Holiday Magic, Inc.*, 550 F.2d 1173, 1178 (9th Cir.1977); Order of July 28, 1988 at 3.[5] Additionally, the Court must be convinced that each settlement is the product of good faith negotiations conducted at arms' length and that there has been no fraud, overreaching, or collusion on the parts of the negotiating parties. *Officers for Justice*, 688 F.2d at 625, *Ellis v. Naval Air Rework Facility*, 87 F.R.D. 15, 18 (N.D.Cal.1980), *aff'd*, 661 F.2d 939 (9th Cir. 1981).

■ In conducting its analysis and making its determinations, the Court must take into consideration any unique facts and circumstances. Thus, the weight and relative importance of the enumerated factors will necessarily vary. The factors cannot be evaluated in isolation, however, but must

---

**5.** These considerations are referred to herein as the *"Officers for Justice* factors."

be appropriately balanced and tailored to contemplate the particular circumstances that surrounded these settlements. *Officers for Justice,* 688 F.2d at 625.

### APPLICATION OF THE STANDARDS TO ALL SETTLEMENTS HEREIN

■ The Court notes that the settlements before it together comprise a nearly "global" resolution of the litigation. While it is urged that it is appropriate to assess such a resolution by viewing the sum of its parts, the Court believes that scrutiny of each separate agreement is compelled. Although the parties, aided by the Court-appointed Settlement Master, Professor Junius Hoffman, participated in settlement negotiations that often involved more than one defendant, with one exception each of these settlement agreements was individually consummated with a single defendant or defendant group and was presented to the Classes and to the Court for its approval. While the terms of the settlements are often similar, they also reflect sometimes significant differences. The resolution of Plaintiffs' claims against each defendant or defendant group altered the circumstances of the litigation and enhanced the probability of yet additional settlements. Indeed, the prior severance of certain defendants in some instances had a significant influence on the consummation of succeeding settlements. That influence, which sometimes dramatically affected the risks and expense of further litigation, enters into the Court's evaluation of those settlements.

Despite this need to examine each of these settlements separately, however, certain of the *Officers for Justice* factors can be viewed from a broader perspective because they remained fundamentally unchanged or had a relatively uniform relationship to all of the settlements. Other factors can be assessed both in terms of their common significance to all settlements and also for their more individual bearing on the unique facts and circumstances of a particular settlement or settlements.

■ The Court begins its assessment of these settlements by considering, where appropriate, the *Officers for Justice* factors in the context of the settlement agree-ments overall. Thereafter, the factors will be addressed in connection with particular settlements where they have a unique or special bearing.

### *The Strength of Plaintiffs' Case*

Before making any determination regarding the strength of Plaintiffs' case, it is first necessary to observe that such an assessment is not intended to involve any ultimate conclusions regarding the contested issues of fact and law that underlie the merits of this litigation. *See, e.g., Officers for Justice,* 688 F.2d at 625. Such a determination would not be possible because the evidence was never fully presented. Furthermore, the settlements were induced in large part by the very uncertainty as to what the outcome would be, had litigation continued. Nonetheless, the Court is in a position to evaluate objectively the strengths and weaknesses inherent in the litigation and the impact of those considerations on the parties' decisions to reach these agreements.

■ Plaintiffs were limited as to the legal theories under which they could bring this action. Because the suit concerned the issuance of municipal bonds, Plaintiffs would have needed to prove scienter—intent to deceive or recklessness—in connection with the misrepresentations alleged under § 10(b) of the Securities Exchange Act of 1934. The legal requirements associated with proof of this mental state are exceedingly stringent and laden with peril. Success of the claims under § 21.20.430 of the Washington State Securities Act was similarly at risk because of developments in the law during the period of this litigation that threatened to restrict the Act's applicability and necessitate proof of scienter. Proof of negligent misrepresentation might have sufficed to establish liability under Plaintiffs' common law claims, but ongoing developments in the Washington courts posed a risk to the viability of those claims, as well. Secondary liability claims and the allegation of a conspiracy among defendants also posed extraordinary legal obstacles. All of these considerations and the appreciable risks they presented had to

be factored into the negotiating parties' appraisals of the strength of their relative positions. The Court, also, recognizes the implications they presented.

The particular misrepresentations that were alleged posed evidentiary hurdles that also helped to promote a voluntary resolution of this action. The Official Statements for Projects 4/5 were alleged to contain material misrepresentations and omissions in connection with six different topics discussed in those Statements. The alleged misstatements and omissions concerned: the region's need for power; the estimated costs of construction and dates of operation of the two Projects; the eighty-eight Participants' ability to raise sufficient revenue to fulfill the financial obligations they had, in the Participants' Agreements, agreed to meet; the Participants' willingness, at the time they signed the Agreements, to pay for the projects; statements regarding the Participants' authority to have entered into the Participants Agreements; and the possibility that Projects 4/5 would be terminated before their completion because of either an absence of need for the power or an inability to continue financing the Projects. Although the Court denied motions for summary judgment on each of these allegations against most of the defendants because of the existence of material issues of fact, each alleged misrepresentation continued to be subjected to attack on a number of fronts by the particular defendants against whom they were claimed.

Plaintiffs were under great pressure to convince the jury of the existence of misstatements and omissions and of each defendant's liability for them under the previously discussed standards of proof. The task would not have been an easy one, though success would have been crucial to a verdict for Plaintiffs. The task that lay before them has been described as follows: Plaintiffs needed to show that hundreds of officers and employees of a large number of public and private entities conspired over a period in excess of ten years, frequently in public meetings, to borrow money they knew they could not and would not repay to build Projects that would be too costly to complete and were not needed in any event,

often contrary to their own individual interests as Bondholders.

■ Significant barriers were placed in the paths of Plaintiffs. Many of the defenses are unique to one or more of the defendants and will be discussed in connection with their individual settlements. However, it is necessary to recognize that, throughout the course of the litigation, defendants vociferously protested, correctly, that hindsight was not actionable with respect to the alleged misrepresentations. There is no denying that the events described came to pass. The region's need for power did not meet the projected expectations; the estimated costs of construction and dates of operation of the two Projects were significantly understated and required continual upward revision; the Participants' ability to raise sufficient revenue to fulfill the obligations they had agreed to pay, absent the plants' operation, became questionable; many Participants proved to be reluctant to pay once the Projects were terminated; certain Participants' authority to have entered into the Participants Agreements was deemed not to have existed; and the Projects were, in fact, terminated before their completion because of a want of need for the power and a corresponding inability, in the face of extraordinarily high interest rates, to continue financing them. All of these occurrences are extraneous to this action, however, because it concerns Plaintiffs' need to show falsity of these representations *at the time they were made*—years before the events materialized. The fact that a soundly-based opinion, projection, or forecast ultimately may have proven incorrect, without more, is not the equivalent of fraud. *See, e.g., Marx v. Computer Sciences Corp.,* 507 F.2d 485, 489–90 (9th Cir.1974).

The Court recognizes that certain circumstances were, of course, highly favorable to Plaintiffs' case. Many Bondholders are elderly. Some had invested their life savings in these bonds. Many expressed belief that the State of Washington and/or the United States government stood behind the WPPSS 4/5 bonds. Few, however, understood that the tort claims in MDL 551 are

quite different from the claims adjudicated by the Washington courts in the *Chemical Bank* litigation in which the Participants Agreements had been invalidated. Defendants were not about to let such misunderstandings infect the decisions to be made by the jury. Nor could the Court have permitted this to occur. The Court cannot fault Plaintiffs for having chosen to pursue settlement, given the burdens of proving their case to the jury.

### The Risk, Expense, Complexity, and Likely Duration of Further Litigation

Because all of these settlements occurred during, or within the months prior to trial, evaluation of this factor really contemplates many risks, expenses, complexities and time factors common to all. When the earliest of these settlements was reached, estimates of a two-year trial were being suggested. Although the advent of each settlement presumably reduced the time that would have been required to try the case, it appeared likely that trial might nonetheless approach the original time estimate. Three months passed during the testimony of Plaintiffs' first witness alone.

A number of practical problems existed in the conduct of the trial. Washington area witnesses were beyond the reach of the Court's subpoena power, forcing Plaintiffs to elect among alternatives of foregoing their testimony, offering video-taped or written depositions, or availing themselves of the use of satellite-transmitted televised "live" testimony. Each alternative had associated costs in terms of strategy, proof, and money. None would have been as effective as the presence of a live witness.

The case, and the mechanics of trial, were enormously complicated. The litigation was characterized by complex issues. Its consolidation and massiveness alone generated a number of difficult conditions. Additionally, the absence of legal precedent in many areas and the constantly developing body of existing law in others further aggravated the complexities and increased existing risks throughout the six-year period of the litigation. Significant obstacles plagued Plaintiffs on some issues even upon the brink of these settlements. Strategic considerations required continuous re-evaluation and revision of the litigants' positions as settlement agreements were reached with various defendants.

Costs of maintaining and managing Plaintiffs' and Defendants' data bases were extremely high, as were costs associated with the out-of-town parties' presence for trial in Tucson, Arizona. Because attorney fees are awarded out of any common settlement fund obtained in Class litigation such as this, each day's continuation of the litigation had the potential to reduce the sum available for distribution to Class Members. The complexity of this litigation and the sheer number of defendants necessitated considerable resources and personnel to provide adequate representation of Plaintiffs. Insurance coverage, the source of settlement payments for a number of defendants, was being depleted by the costs of litigation. Appeals of several rulings had already been taken and there was virtual assurance that any final decision would be appealed, regardless of who it might favor, necessitating additional monetary outlay and further delay for all parties. Thus, even a verdict for Plaintiffs might have proven to be a Pyrrhic victory for many Bondholders.

The ultimate risk of continued litigation—the risk of an adverse verdict—also weighed heavily in the parties' considerations. The significance to be assigned to this risk in assessing the fairness, adequacy and reasonableness of the settlements is not capable of measurement, but it is not inaccurate to say that there was never a moment when a Plaintiffs' victory was assured.

The uncertainty of victory and the certainty of ever increasing costs, both monetary and otherwise, thus, validate the undertaking of serious settlement negotiations. In many respects, these complexities, risks and costs effectively *mandated* compromise and settlement of this litigation.

### The Amount Offered in Settlement

Although this factor will be considered in connection with each separate settlement, it is appropriate to make certain observations regarding the aggregate amount of

these settlements. Even ignoring the potential for increased recoveries as a result of insurance litigation, these settlements combine to a total payment by defendants of more than $580 million. When added to the amounts paid by previously settling defendants, the pre-interest sum of all settlements in this action exceeds $690 million.[6] The amount is quite clearly substantial. The figure approaches fifty percent of the amount of losses that were calculated as a result of Proof-of-Claim procedures that were implemented by this Court to aid in the conduct of litigation and were to be followed by Class Members.[7] While a comparison of the proposed Settlement Fund to the face value of the bonds may make it appear to be less than ideal, the Court hastens to point out, once again, that this suit was not a contract action. Proof of the misrepresentations that the case *did* involve was fraught with risk and recovery was far from certain.

The amount offered in settlement cannot, in any event, be viewed in isolation. It must be considered in the proper context— that of the probable recovery, even assuming a finding of liability in Plaintiffs' favor. The next factor contemplates considerations associated with the amount of damages potentially recoverable in an action such as this.

*The Relationship of the Settlement Amount with the Likelihood of Success and Potential Range of Recovery at Trial*

The amount of Plaintiffs' total pre-interest recovery and many of the risks associated with the potential for success have been sufficiently described. There is yet a third important consideration that must be factored into the assessment of the amount of these settlements—the potential range of recovery had a verdict in Plaintiffs' favor been reached.

The issue of the proper measure of damages in this litigation was heatedly argued throughout. The propriety of using the restrictive out-of-pocket rule, as opposed to a more generous rescissory measure of damages, has been vigorously asserted as a virtually conclusive determinant of the fairness, reasonableness and adequacy of these settlements by nearly all parties seeking their approval. Both sides were prepared to offer protracted expert testimony on this crucial issue. The area is replete with peril, and the possibility loomed large that, even if a verdict for Plaintiffs were reached, the result might have been a monetary award considerably *smaller* than the aggregate amount of these settlements.

Additionally, many of the issues related to the causes of investors' losses had been the subject of earlier motions and briefing. Although the issues survived, Plaintiffs' counsel recognized a significant risk that a jury would attribute much of the price decline in the 4/5 bonds to factors other than the misrepresentations alleged in this lawsuit. The *Chemical Bank* decisions, interest rate fluctuations, the nuclear power environment, and other independent market forces contributing to a general decline

---

**6.** In the Notice of Settlement, it was indicated that Class Plaintiffs' counsel anticipated that, if these settlements are approved, distribution of funds might occur in December 1989. At that time, the Notice indicates, the total amount of the Settlement Fund, including payments from prior settlements, together with interest accrued on both prior and the instant settlements, will have increased to approximately $757,000,000.

**7.** The Court required all members of the certified class who purchased WPPSS 4/5 bonds between February 23, 1977 and January 22, 1982 (the Pre-Termination Class period) to complete Proof-of-Claim forms identifying their purchases. These persons, absent good cause for failing to complete and return the form, were advised that they would be barred from receiving money in the event of a recovery arising from a settlement or trial if they had not

completed and returned the form by February 27, 1987. Purchasers during the period January 23, 1982 through June 15, 1983 (the Post–Termination Class period) were requested, but not required to complete the form by July 31, 1988. Order of November 19, 1986. That class was not yet certified at the time of the Order. At the time the Settlement Notice was prepared, Class Members had submitted proof of claims calculated to amount to approximately $1.4 billion in losses for the Pre–Termination Class and $147 million for the Post–Termination Class. Since members of the latter Class have not been required by the Court to submit proof of their claims, the latter figure may increase. So, too, may the amount claimed by Pre–Termination purchasers, if good cause is shown to account for the failure of such purchasers to have filed timely proof of claims.

in the bond market, for example, may have been found to account for much of the investors' loss.

Determining the dates of disclosure of the claimed misrepresentations would have complicated the computation of a price differential and further exacerbated any calculation of damages. All of these concerns lend support to an affirmative conclusion about the fairness, reasonableness and adequacy of the settlements overall.

### The Extent of Discovery Completed and the Stage of Proceedings

The next *Officers for Justice* factor that merits a broad overview concerns the stage of these proceedings at the time the settlements were reached. As indicated, the litigation had been going on for more than five years when the first of these settlements occurred. Trial was imminent and counsel were engaged in preparation for it. Discovery was virtually complete.

Discovery in the litigation had been comprehensive. An estimated 200 million document pages were produced, reviewed and evaluated. Depositions of more than 300 persons were taken over a period of three and one half-years. A number of these witnesses provided expert testimony in the important areas of causation and damages. The completion of this vast amount of discovery provided a comprehensive picture and permitted counsel to evaluate the strengths and weaknesses of the litigation in connection with their contemplation and consummation of these settlements. The Court, also, is aware of much of the information discerned through discovery and is in a unique position to evaluate the strengths and weaknesses, as well as the equities, of the parties' positions. This factor, therefore, presents no obstacles to this Court's assessment of the settlements and provides assurance of the validity of its determinations.

### The Experience and Views of Counsel

Both Class counsel and counsel for Chemical Bank deem the settlements to be fair, reasonable, adequate and deserving of the Court's approval. Counsels' opinions warrant great weight both because of their considerable familiarity with this litigation and because of their extensive experience in similar actions. *Officers for Justice*, 688 F.2d at 625. During the course of this litigation the Court has had abundant opportunity to appraise and evaluate the judgment and representation of all counsel. The litigation was characterized, as it should be, by aggressive advocacy and extraordinarily capable adversarial postures.

There is likewise every reason to conclude that settlement negotiations were vigorously conducted at arms' length and without any suggestion of undue influence. Unlike the situation in most cases such as this, Class Counsel were particularly well positioned to resist coercive pressures by any defendant because they were not required to advance tremendous out-of-pocket expenses.[8]

The continuous involvement of the Settlement Master further serves to confirm that the negotiations were undertaken and concluded in good faith and were otherwise untainted. The Settlement Master has unqualifiedly recommended these settlements. The Court is aware that ground was given grudgingly after extensive—and often discordant—negotiations. There is no suggestion that any point of dispute was abandoned cavalierly, or for the purpose of counsels' self interest, or for expediency. Counsels' decisions to strive for and consummate these settlements will not, therefore, be reproached.

### The Reaction of Class Members to the Proposed Settlement

The Class Notice delineated procedures to be followed by Class Members who wished to object to these settlements. Objecting Class Members were required, among other things, to specify in writing their objections, the settlement or settlements to which they applied, and the grounds for them or reason they desired to appear and be heard. These statements were to be submitted to the Court and to the parties. Several objections were filed that conformed, at least for the most part, to these requirements. These will be addressed in connection with the particular settlement or settlements with which they

---

**8.** Chemical Bank advanced nearly all such expenses.

take issue. Other objections were filed by non-Class Members or by groups whose objections were presented on behalf of both Class Members and non-Class Member Bondholders. Finally, in response to suggestions contained in a form letter mailed by a group known as the Bond Investors Association, the Court received mail from numerous individuals, most of whom are, presumably, Class Members. Copies of all such correspondence received prior to the settlement hearings were provided to counsel. It is to the general content of these letters from Class Members that the Court now turns.

The Bond Investors Association (or "Association") describes itself as a "non profit Bondholders organization concerned with promoting the interest of Bondholders." The organization maintains data on bond defaults throughout the nation. It has participated in a number of different kinds of efforts in pursuit of a recovery for WPPSS Bondholders. The organization itself, presided over by Mr. C. Richard Lehmann, is not a Class Member. Nor are some of its constituents, whose purchases of 4/5 bonds were made after June 15, 1983.[9] However, many individual Bondholders who are affiliated with the organization are Class Members.

Early in 1989 the Bond Investors Association sent a letter to WPPSS 4/5 Bondholders regarding the proposed settlements in MDL 551. The letter referred to "the ugly truth behind the MDL 551 settlement and how you have been sold short." It specifically attacked the proposed settlements with the Supply System, BPA, and the State of Washington. It contained comments critical of certain actions of Chemical Bank and a statement concerning the amount of attorney fees and expenses anticipated in MDL 551. The letter advised Bondholders that they could "write the judge" about each of the enumerated items, and informed recipients that "he can reverse any portion of the settlements ... and force those parties back to the negotiating table or back into court." The fourth page of the bold-print letter was a form containing eight statements that could be checked to show the respondent's agreement or disagreement (or satisfaction, dissatisfaction or "outrage") with respect to the three settlements discussed in the letter; certain actions of Chemical Bank; legal fees requested; and the recipient's reliance on the Bondholders Committee (of which Mr. Lehmann is treasurer), Chemical Bank or Class attorneys. The recipient was asked whether he had a claim filed in the MDL litigation, and a blank space allowed the writer to show the face amount of current holdings in WPPSS 4/5 bonds. It was suggested that recipients send copies of this completed "opinion survey" to the Court and to Chemical Bank. Addresses were provided.

This letter generated a large volume of mail to the Court—in excess of 600 pieces. The Court read every letter. The correspondence ranged from long, thoughtful letters to mere copies of the survey form. Nearly all reflected dissatisfaction with the settlements. Many writers expressed their opinion that absolutely no settlement should be approved unless it returned to them the *full* principal they had invested in the WPPSS bonds, plus interest.

A number of writers disclosed that they had invested their life savings in Project 4/5 bonds and went on to describe poignantly the impact that the default has had on their welfare. Many expressed their belief that this Court could simply compel full restitution of their investment. Many noted that this lawsuit was "their last hope" and indicated a belief that the litigation somehow provided the opportunity for this Court to "reverse" the decision of the Washington State courts that had invalidated the Participants' Agreements. A significant number of writers expressed incredulity that some of the defendants had made a contract that this Court could not simply require them to perform. That matter was not before this Court for decision, however, and the Court lacked power to alter the Washington Supreme Court ruling.

Many older writers noted that, because of their age, an expeditious resolution was desirable. Yet they demanded complete

9. The WPPSS 4/5 bonds continue to trade at the present time.

satisfaction. Some urged the Court to re-write settlement terms, which it cannot do. A few suggested a return to trial. The Court is mindful of the length of time that would be consumed by a resumption of litigation, trial, post-trial proceedings, appeal and (unthinkably) re-trial. Even ignoring the possibility of *no* recovery, success after such proceedings would be years away and, for many older bondholders, no victory at all.

Only a handful of letter writers indicated any real understanding of the nature of the claims in this action and the extent of relief that was potentially available. Few made distinctions among the many defendants or seemed to recognize that valid defenses could be maintained. Many blamed their brokers, who have not been named in this action. Some demanded the full face value of their bonds, regardless of what they had paid or when they had purchased.

The letters were often emotional and moving. Many stirred tremendous sympathy and aroused a strong sense of injustice on behalf of the writers. Those feelings, however, did not arise through valid criticisms of the terms of any particular settlement agreement. They stemmed, rather, from the generalized misfortune and outrage experienced and expressed by these correspondents. Almost universally they complained about buying a highly rated and recommended security only to find it to be essentially valueless. The Court does not have boundless power to rectify such grievances, however, even though they may be legitimate. The Court is constrained by our legal system, and the relief requested by many of these aggrieved Bondholders is simply outside the parameters of this Court's powers and the issues in this case.

It is both necessary and important to consider all substantive objections of Class Members to a settlement, *See, e.g., Officers for Justice,* 688 F.2d at 624–25, and, insofar as these writers' comments were directed at the terms of specific set-tlements, they will be addressed in the following sections of this Order that deal with those specific settlements. Nonetheless a settlement is not to be deemed unfair or unreasonable simply because a large number of Class Members oppose it. *See, Bryan v. Pittsburgh Plate Glass Co.,* 494 F.2d 799, 803 (3d Cir.1974), *cert. denied,* 419 U.S. 900, 95 S.Ct. 184, 42 L.Ed.2d 146 (1974); *Equal Employment Opportunity Comm'n v. Hiram Walker & Sons, Inc.,* 768 F.2d 884 (7th Cir.1985), *cert. denied,* 478 U.S. 1004, 106 S.Ct. 3293, 92 L.Ed.2d 709 (1986); *Reed v. General Motors Corp.,* 703 F.2d 170 (5th Cir.1983); *Cotton v. Hinton,* 559 F.2d at 1331. Thus, the *volume* of letters will not be given undue weight.

In addition to the letters received by the Court in reaction to the Bond Investors Association communication, several other groups or individuals expressed general objections to the settlements overall. Both generalized and specific objections were voiced in papers filed on behalf of a group of four Institutional Investors.[10] At this point it is appropriate to observe that, for the most part, the more general objections stem from these objectors' assumption that the case assured certain victory for Plaintiffs. Their conclusion that the amounts of the settlements are unfair, unreasonable or inadequate is not supported, however, because this premise is fallacious. Contrary to contentions appearing throughout these objectors' papers, this was *not* an "obvious fraud case" in which "no doubt existed as to the liability of many of the Settling Defendants." In contrast to the broad, and remarkably naive, assertions of these arguably sophisticated objectors, the case did in fact "raise serious questions as to liability" of many defendants, and the risk of a finding of nonliability was very real throughout. The Court has already described the burdens facing Plaintiffs in this litigation, and there is more than adequate reason to conclude that the aggregate amount of these settlements, to which these Institu-

---

**10.** These investors were Continental Assurance Company, Trust Claimants of Kemper Financial Services, Inc., certain Banks of First Midwest Bancorp, Inc., and State Farm Automobile Insurance Company. The first three are Class Members; the fourth is not. Many of these institutional objectors' concerns address counsels' petitions for attorney fees which is outside the scope of this Order.

tional Investors take exception, is fully satisfactory, given the risks associated with a full trial of the issues.

## ANALYSIS OF INDIVIDUAL SETTLEMENTS

The Court will now consider the separate settlements and appropriate *Officers for Justice* factors associated with each to the extent they have not already been discussed. The Court's rulings on the individual settlements are based upon the following considerations as well as the preceding analysis insofar as it pertains to a determination of the fairness, adequacy and reasonableness of each settlement. Repetition of the foregoing discussion will be avoided, therefore, *only* in the interest of simplicity.

### THE CITY OF SEATTLE

Class Plaintiffs, Chemical Bank and defendant City of Seattle ("Seattle") framed a memorandum of understanding of their settlement in April, 1988. Proceedings against the City were stayed and it was severed from further litigation by Order of the Court on May 5, 1988. The parties' final agreement reflecting the terms and conditions of their settlement, the Stipulation and Agreement of Compromise and Settlement between Plaintiffs and the City of Seattle, was filed with this Court on September 30, 1988. The terms of this settlement embrace the City, a Washington municipal corporation, its insurance carriers as to policies insuring Seattle, and four individually named defendants who were employees of the Municipality of Seattle and designees on the WPPSS Board of Directors and Executive Committee.

Unlike many of the settling defendants, the City of Seattle was not a Participant in Projects 4/5 and had not, therefore, signed a Participant's Agreement, although its employees were members of the WPPSS Board of Directors and Executive Committee. Thus, there was some perception that the City's liability was potentially less than that of the Participants in the projects. Discovery was virtually complete at the time of the settlement, and the parties had the ability to appraise the liability issue fully before agreeing to settle. Whatever their determination, the City has paid the immense sum of $50,000,000, mainly from relatively substantial insurance coverage, into an interest earning escrow account to end its involvement in this litigation and to permit its personnel to turn their attention elsewhere. No specific objections have been raised to this settlement and the Court has considered all relevant matters otherwise submitted to it. The Court finds that its appraisal of all appropriate factors indicates that the terms and conditions of the Seattle settlement are fair, reasonable, and assuredly adequate in accordance with the mandate of Rule 23, Fed.R.Civ.P.

### FERRY AND KITTITAS

Public Utility District No. 1 of Ferry County, Washington ("Ferry") and Public Utility District No. 1 of Kittitas County, Washington ("Kittitas") reached an understanding of agreement with Plaintiffs in April, 1988. They were severed from the litigation and proceedings against them were stayed the following month. The terms of their agreement with Class Plaintiffs and Chemical Bank are contained in the Stipulation and Agreement of Compromise and Settlement Between Plaintiffs and Ferry and Kittitas, which was filed with this Court on October 6, 1988.

Like Seattle, these two utilities were members of the Supply System, although neither was a Participant in Projects 4/5. Unlike Seattle, neither had a representative on the WPPSS Executive Committee. Their potential for liability, thus, stemmed largely from allegations that member utilities were vicariously liable for their appointed directors' actions on the WPPSS Board. These allegations were vigorously defended and their proof fraught with difficulty.

These two utilities are among the smallest in Washington in terms of revenues, customers and sales. Their proportionate rates, debt and operating expenses are among the highest in the state. Their settlement agreement requires a payment of $1,750,000 from insurance coverage into an interest earning escrow account. This coverage, which was being consumed by litigation costs, represented the only substantial asset that could be obtained by Plaintiffs

without precipitating virtually certain bankruptcy proceedings for the utilities.

The Court finds, after evaluating all relevant circumstances, that the terms and conditions of the Ferry and Kittitas settlement are fair, reasonable, and adequate in accordance with the mandate of Fed.R.Civ.P. 23.

### OREGON PUBLIC ENTITIES

The Oregon Public Entities encompasses to a group of ten cities and utility districts that had signed Participants Agreements for Projects 4/5 but were not members of the Supply System. Seven individuals are also included in the terms of these public utilities' settlements. Two separate settlement agreements were entered into with Plaintiffs on behalf of these defendants. The first agreement, involving the cities of Cascade Locks, Drain, Milton–Freewater, Springfield and the McMinnville Water & Light Commission, as well as three individuals, was set forth in a memorandum of understanding on April 29, 1988. On the same day an agreement in principle was reached with the City of Canby, the People's Utility Districts of Central Lincoln, Clatskanie, Northern Wasco County and Tillamook and with four individuals. The terms and conditions of these settlements are contained in the Final Memorandum of Settlement Agreements Between Plaintiffs and Oregon Public Entities Defendants, filed with the Court on November 23, 1988. An amendment to the settlement was filed on December 22, 1988. The agreement of the five cities calls for a combined payment of $13,162,500. The second agreement requires payments totalling $18,837,500. The sum of payments included in these two settlement agreements, thus, amounts to $32 million. That amount has been accumulating interest in escrow accounts.

Because these defendants did not sit on the Supply System Board, Plaintiffs would have had difficulty at trial establishing primary liability against them in connection with many of the reputed misrepresentations and omissions allegedly contained in the Official Statements. The Oregon Entities' defenses on many issues, like those of other defendants, would be vigorous. Plaintiffs' crucial allegations regarding misrepresentations of the entities' ability to pay, willingness to pay, and authority were particularly vulnerable, in part because the Oregon Supreme Court, unlike that of Washington, had refused to find that its local officials lacked authority to execute the Participants' Agreements. *See DeFazio v. WPPSS*, 296 Or. 550, 679 P.2d 1316 (1984).

Considering the remoteness of the Oregon Public Entities from decisions regarding the content of the Official Statements and the sound defenses available to them, the Court concludes that the amount paid in settlement by these defendants, who together held a relatively small eight percent share in Projects 4/5, is acceptable. This decision is supported, also, by recognition of the impact of a decision announced shortly after this settlement was reached. Approximately two weeks later, this Court relieved Non–Member Participants such as these of a duty of disclosure to post-termination purchasers. Order of May 12, 1988.

Having appraised these, as well as the circumstances surrounding the settlements in general, the Court finds that the terms and conditions of the Oregon Public Entities' settlement are fair, reasonable, and adequate in accordance with the mandate of Fed.R.Civ.P. 23.

### SMALL UTILITIES

The Small Utilities is the collective name for twenty-four small Participant utilities [11], none of which was a member of the Supply System. The Small Utilities reached a settlement agreement with Plaintiffs in May, 1988. The terms of this

---

**11.** The Cities of Bandon, Oregon; Bonners Ferry, Idaho; Burley, Idaho; Centralia, Washington; Heyburn, Idaho; Idaho Falls, Idaho; Port Angeles, Washington; Rupert, Idaho; the Town of McCleary, Washington; the Clearwater Power Company; Elmhurst Mutual Power & Light; Glacier Electric Cooperative; Idaho County Light & Power; Lower Valley Power & Light; Nespelem Valley Electric Cooperative; Northern Lights, Inc.; Ohop Mutual Light; Okanogan County Electric Cooperative; Parkland Light & Water Company; Prairie Power Cooperative; Rural Electric Company; Unity Light & Power; Wells Rural Electric Company; West Oregon Electric Cooperative.

agreement are embodied in the Stipulation and Agreement of Compromise and Settlement, filed with this Court on October 6, 1988. The agreement requires the Small Utilities to pay $25,819,462 into interest bearing escrow accounts.

Together these utilities, located in Washington, Oregon, Idaho, Nevada, Wyoming and Montana, shared approximately six and one half percent of the ownership of Projects 4/5. Discovery indicated that these mainly remote defendants were essentially uninvolved in the preparation, review or approval of the Official Statements. Proof of Plaintiffs' claims against them, thus, would have been especially difficult. Like many defendants, this group contends that the utilities that compose it relied on expert analyses and opinions in regard to many of the issues alleged against them. Settlement became a viable option, they say, only after they determined that prospective monetary and personnel costs and risks of jury confusion of the issues outweighed the benefits of continued litigation.

For these reasons, as well as relevant ones discussed in connection with the settlement of the Oregon Public Entities, and because of the affirmative general assessment of pertinent *Officers for Justice* factors, the Court finds that the terms and conditions of the Small Utilities' settlement are fair, reasonable, and adequate in accordance with the mandate of Fed.R.Civ.P. 23.

## UNAFFILIATED PARTICIPANTS

On May 26, 1988 Plaintiffs and a group of five non-Member Participants reached agreement to settle. These five Washington defendants were the Benton Rural Electric Association, Orcas Power & Light Company, Public Utility District No. 1 of Pend Oreille County and the cities of Blaine and Sumas. The Stipulation and Agreement of Compromise and Settlement between Plaintiffs and these Unaffiliated Participant defendants was filed with this Court on October 6, 1988.

The terms of this settlement require payment of $7,410,927 into interest earning escrow accounts. Together these Participants held less than a two percent share of Projects 4/5. Like the settlements of other non-Member Participants, no specific objections were raised to this settlement and, after due consideration of all relevant factors, the Court finds that the terms and conditions of the Unaffiliated Participants' settlement are fair, reasonable, and adequate in accordance with the mandate of Fed.R.Civ.P. 23.

## MID–COLUMBIA DEFENDANTS

Mid–Columbia Defendants is the name given to three Public Utility Districts that reached a settlement agreement with Plaintiffs on July 18, 1988. The memorandum of that agreement and an addendum to it were filed as attachments to the Stipulation and Order Regarding Settlement, Severance and Stay as to the Mid–Columbia Defendants, on August 30, 1988. A second addendum to the agreement was subsequently filed with the Court on October 12, 1988. These documents memorialize the agreement between Class Plaintiffs, Chemical Bank and defendants Chelan County PUD, Douglas County PUD, Grant County PUD and six individual officers, directors, employees and commissioners who were neither directors of the Supply System nor members of the Participants Committee. Together the documents constitute the Mid–Columbia settlement agreement.

These public utility districts were both members of the Supply System and Participants in Projects 4/5. Together they held a minimal (1.23%) share of the Projects. They have paid a total of $20,000,000 to settle Plaintiffs' claims against them in this action. That amount is being held in an interest-bearing escrow account. The substantial amount of these public utilities' settlement payments reflects the availability to them of insurance coverage, a circumstance not shared by other Member Participants.

Given the significant contribution and the modest share of the Projects held by this small group of public utilities, and after due consideration of the defenses propounded and of the assessment of other *Officers for Justice* factors, the Court finds that the terms and conditions of the Mid–Columbia settlement are fair, reason-

able, and adequate in accordance with the mandate of Fed.R.Civ.P. 23.

COLUMBIA DEFENDANTS

The Columbia Defendants are seventeen rural electric cooperatives that, like the Oregon Public Entities and the Small Utilities, were Participants in Projects 4/5, but were not members of the Supply System.[12] An eighteenth Columbia Defendant cooperative, Pacific Northwest Generating Company, was a non-member and non-Participant, though it was represented on the Participants' Committee. This defendant group, along with three individuals who attended a number of Participants Committee meetings, reached a settlement agreement with Class Plaintiffs and Chemical Bank in August, 1988. The terms of the settlement are contained in the Stipulation and Agreement of Compromise and Settlement Between Plaintiffs and Columbia Defendants and the supplemental Stipulation and Agreement of Compromise and Settlement Between Plaintiffs and David Piper, Roy Lindley and Tom Howard, which were filed on October 31, 1988.

In addition to assigning insurance rights of individual defendants who are present or former officers or employees of certain of the Columbia Defendant Utilities[13], this settlement calls for payment of $53,080,000 to Plaintiffs.

Together the Columbia Defendants held a nearly 14% share of Projects 4/5. The decision of this group to settle the litigation several weeks before the start of trial powerfully demonstrates the significance of the inevitably high monetary and personal costs to defendants of trying and appealing the case. At that time the parties fully grasped the issues and facts involved. The Court had previously acknowledged several deficiencies in Plaintiffs' case against these defendants stemming from their rather at-

tenuated relationship to bond purchasers. Their defenses to Plaintiffs' claims were strong, and there was more than a remote possibility that a jury might find an absence of liability for misrepresentation on the part of these defendants. Given these considerations, as well as those previously discussed, the Court finds that the terms and conditions of the Columbia Defendants' settlement are fair, reasonable, and adequate in accordance with the mandate of Fed.R.Civ.P. 23.

WOOD DAWSON SMITH & HELLMAN

On August 22, 1988 Class Plaintiffs reached an agreement to settle their claims against the law firm of Wood Dawson Smith & Hellman ("Wood Dawson"). The terms of that settlement are contained in the Stipulation and Agreement of Compromise and Settlement Between Class Plaintiffs and Defendant Wood Dawson Smith & Hellman, filed with the Court on October 5, 1988.

The terms of the Wood Dawson settlement, among other requirements, call for a payment of $500,000 to the Class. That amount has been deposited into an interest bearing escrow account. The settlement is subject to entry of an order barring claims for contribution under federal and Washington State Securities laws ("Bar Order"). Absent such an order, the settlement will be terminated in accordance with its terms.

Wood Dawson was not sued by Chemical Bank in this litigation. The firm was prepared to present testimony to show that its opinion—that the Participants' Agreements that it had examined were valid and enforceable—was reasonable and honestly held. Class Plaintiffs would need to convince the jury that the opinion itself was "false" or that Wood Dawson acted with scienter or recklessness in rendering it. Victory was by no means assured. Success

---

**12.** Columbia Rural Electric Association, Inc.; Blachly–Lane County Cooperative Electric Association; Columbia Basin Electric Cooperative, Inc.; Consumers Power, Inc.; Coos–Curry Electric Cooperative, Inc.; Douglas Electric Cooperative, Inc.; Hood River Electric Cooperative; Lane Electric Cooperative, Inc.; Midstate Electric Cooperative, Inc.; Salem Electric; Umatilla Electric Cooperative Association; Wasco Electric Cooperative, Inc.; Kootenai Electric Coop-

erative, Inc.: Fall River Rural Electric Cooperative, Inc.; Lost River Electric Cooperative, Inc.; Raft River Rural Electric Cooperative, Inc.; and Inland Power & Light Company.

**13.** Proceeds that may be obtained under these policies were transferred by Plaintiffs to the Washington Public Utilities Group and to Klickitat Public Utility District under the terms of their settlements.

on secondary liability issues was likewise uncertain.

This settlement, unlike those discussed previously in this Order, contains a provision requiring a Bar Order in order to discharge this settling defendant from future liability arising from matters intended to be resolved by the settlement. The provision is contained in this settlement because the Agreement lacks protective provisions extended by Plaintiffs to other settling defendants to indemnify them in the event of similar future challenges.

A requirement for a Bar Order was also contained in the settlement agreement of the Class Plaintiffs and Houghton Cluck Coughlin & Riley ("Houghton Cluck"), special counsel for the Supply System in connection with the issuance of the Project 4/5 Bonds. That settlement, and the Bar Order provision contained therein, were previously approved by this Court. Order dated July 28, 1988. The settlement agreements of three other defendants in this litigation also contain similar Bar Orders.[14]

 Objection was taken to the Bar Order provision of the Wood Dawson settlement by Interpacific Investors Services, Inc. Interpacific is a defendant in two actions arising out of purchases of WPPSS 4/5 bonds[15]. Interpacific raised the same objections in connection with the previous Houghton Cluck settlement. Although the Court's decision to approve that settlement, and the Bar Order provision contained therein, effectively demonstrated the Court's authority to make such a ruling, Interpacific nonetheless suggests that the Court lacks "jurisdiction" to bar claims as against themselves. This contention is unsupported by the law. Federal courts have authority, pursuant to the All Writs Act, 28 U.S.C. § 1651(a), to issue "all writs necessary or appropriate in aid of their respective jurisdiction." This Circuit has held that the power must be broadly construed. *Hamilton v. Nakai*, 453 F.2d 152, 157 (9th Cir.1972), *cert. denied*, 406 U.S. 945, 92 S.Ct. 2044, 32 L.Ed.2d 332 (1972); *see SEC v. G.C. George Securities, Inc.*, 637 F.2d 685, 688 (9th Cir.1981). The power has been used specifically in furtherance of complicated settlement agreements in multi-district class action securities litigation. *See In re Baldwin–United Corp.*, 770 F.2d 328 (2d Cir.1985). It is within this Court's power and authority to reach a decision regarding the propriety of a Bar Order and to enter such an Order to preclude the future interposition of contribution claims against settling defendants.

A second argument is voiced in objection to the proposed bar of contribution claims under the Revised Code of Washington. R.C.W. 4.22.040 provides for a right of contribution between or among persons who are jointly and severally liable upon the same claim for the same injury. R.C.W. 4.22.060 permits a trial court to discharge a settling party from liability for contribution after determining that the amount of a settlement is reasonable. Interpacific contends that, because the injuries claimed by plaintiffs in the *Vogel* and *Allen* actions in which it is a defendant may differ from those complained of by Class Plaintiffs in MDL 551, the Court should not bar its potential right of contribution against Wood Dawson. If the injuries claimed by plaintiffs in the *Vogel* and *Allen* actions are *different* from those claimed in MDL 551, however, neither joint and several liability nor a right of contribution would exist under R.C.W. 4.22.040(1), and an order barring contribution would have no harmful impact on these objectors. If the injuries claimed are *not* different, such an order would extinguish the rights of contribution just as the statute intends such an order to do.

A finding of reasonableness of a settlement under R.C.W. 4.22.060 requires the Court to determine the reasonableness of the amount to be paid, after notice and a hearing. The Settlement Hearing on April 11, 1989 included among its purposes a determination of whether the proposed set-

---

**14.** The Supply System, Beck and BPA settlement agreements.

**15.** *Vogel v. Interpacific Investors Services, Inc.*, U.S. District Court for the Western District of Washington, Case No. C85–1084, and *Allen v. Interpacific Investors Services, Inc.*, U.S. District Court for the Western District of Washington, Case No. C86–719. Plaintiffs in those actions are Class Members in MDL 551.

tlement is reasonable. In its Order of July 28, 1988 approving the Houghton Cluck settlement in this action, the Court enumerated factors identified by the Washington Supreme Court that may be used by a trial judge in making appropriate inquiries and determining whether to approve a settlement.[16] These factors parallel a number of those required by *Officers for Justice* in accordance with Fed.R.Civ.P. 23(e). Several have already been discussed. This objector questions the circumstances related to one of the factors in particular.

Interpacific challenges the assertion that the settlement reasonably reflects Wood Dawson's ability to pay and suggests that the settlement should not be approved because Interpacific has been unable to determine whether the settling defendant could have paid more. There are several flaws in this reasoning. The contention ignores the fact that many disputed issues of liability, as well as significant questions regarding the measure of damages, if liability were found, were associated with the claims against this defendant. It also disregards the existence of vigorous defenses that were urged throughout and would have been advanced at trial.

Moreover, Class Plaintiffs' counsel themselves, after examining financial statements of the partners of the Wood Dawson firm, asserted that the settlement payment constituted the likely maximum of financial resources available to satisfy any judgment in favor of the Class. The Court has conducted an *in camera* review of these financial statements, as well, and they were also reviewed by the Settlement Master, who actively participated in settlement negotiations. This defendant did not have insurance coverage available to Class Plaintiffs and nothing suggests that the settlement was reached in anything other than good faith. Impoverishment, in any event, is neither consistent with, nor required by, the policies underlying the encouragement of settlements as the preferred means of

resolving disputes. *Officers for Justice,* 688 F.2d at 625.

In view of the foregoing considerations, the Court is satisfied that the settlement payment fairly and adequately reflects this defendant's ability to pay and finds it reasonable under the circumstances and within the meaning of R.C.W. 4.22.060. Under the directive of that statute, Wood Dawson is discharged from any liability for contribution asserted as a result of any claims under state law.

The Court is also asked, in connection with this settlement, to approve a bar against future contribution claims under federal law. In its Order approving the settlement of Plaintiffs' claims against defendant Houghton Cluck, the Court contemplated the objections of a number of non-settling defendants and observed at that time that a proper fairness hearing can provide a settling party protection from contribution claims of non-settling defendants under federal law. *See* Order of July 28, 1988 and cases cited therein. The Court noted that the following are among the factors to be considered in an inquiry into the fairness of a settlement in connection with such a proposed bar order:

1) the possible uncollectibility of any larger judgment that might be entered against the settling defendant;

2) the adequacy of the settlement amount in light of the comparative culpability of the settling defendants and the uncertainties of establishing such liability; and

3) the participation of an independent magistrate in the settlement negotiations.

*Nelson v. Bennett,* 662 F.Supp. at 1338; *In re Nucorp Energy Securities Litigation,* 661 F.Supp. 1403, 1408 (S.D.Cal.1987). The Court has adequately discussed the first and third factors, above. Insofar as the second factor is relevant to this settlement, given the fact that all parties to MDL 551 have now reached settlement agreements,

---

**16.** Those factors are: the releasing person's damages; the merits of the releasing person's liability theory; the merits of the released person's defense theory; the released person's relative fault; the risks and expenses of continued litigation; the released person's ability to pay;

any evidence of bad faith, collusion, or fraud; the extent of the releasing person's investigation and preparation of the case; and the interests of the parties not being released. *Glover v. Tacoma General Hospital,* 98 Wash.2d 708, 717, 658 P.2d 1230, 1236 (1983).

the Court relies upon its assessment of the difficulties that faced Plaintiffs in establishing liability against *any* of the defendants and on the fact that the settlement terms were agreed to only after careful analysis by experienced counsel of all known information and risks.

The Court finds, therefore, that the settlement was reached in good faith and is fundamentally fair and equitable sufficient to extinguish contribution claims based on federal law. It is likewise fair, reasonable and adequate in accordance with Fed.R. Civ.P. 23.

## WASHINGTON PUBLIC POWER SUPPLY SYSTEM

■ An agreement to settle Plaintiffs' claims against the Supply System was reached on August 30, 1988, a week prior to the start of trial. The terms and conditions of the agreement between Class Plaintiffs, the Bond Fund Trustee and the Supply System are contained in the Stipulation and Agreement of Compromise and Settlement Between Plaintiffs and Defendant Washington Public Power Supply System, which was filed on March 14, 1989.

The Supply System is a municipal corporation and a joint operating agency of the State of Washington. Its revenues are derived solely from electric generating facilities or projects and from revenue bonds, such as the WPPSS 4/5 Bonds, issued to finance the construction or operation of such projects. During the *Chemical Bank* litigation in the Washington state courts, the Supply System strenuously opposed the position that certain of the Washington Participants lacked authority to enter into the Participants Agreements. Its role in the development of the Official Statements, as well as in this litigation, was central.

The terms and conditions of this settlement involve no monetary payment to the Class. They do require the entry of a judgment on the contract claims of Bondholders, whether or not they are Class Members, although it is not anticipated that any monetary recovery will result from that judgment. These provisions, which were widely published and reported to recipients of the communication from the Bond Investors Association discussed above, have been vehemently opposed. Nonetheless, after substantial consideration of all appropriate factors and circumstances, the Court is prepared, for the following reasons, to approve the settlement.

In papers submitted in support of its settlement agreement, the Supply System forcefully asserts that it is virtually certain that, even if a judgment were entered against it on these claims, no assets beyond those already provided for in the agreement would be available to satisfy it. Washington statutes and the Resolutions adopted in accordance with those statutes severely limit the Supply System's use of funds. In accordance with the statutory scheme, the Supply System, as a joint operating agency, structured each of its projects as a separate utility. As a result, the System has no "general" assets. Instead, any asset is traceable to a particular project, and is restricted or pledged to fulfill obligations of that particular project. Revenues generated by a particular project, or funds raised through the issuance of bonds to finance the construction or operation of such a project, are likewise limited. Washington case law upholds these principles, and other theories as well, that similarly sustain restrictions on the accessibility of projects' funds. In addition, joint operating agencies are prohibited from issuing general obligation bonds.

Plaintiffs recognized the obstacles to executing a judgment on non-Project 4 and 5 assets and the corresponding problem that the Supply System, if it were found liable, could lack recoverable assets. Because of these risks, they made the decision to pursue settlement on the eve of trial. To verify the uncollectibility of any judgment on the tort claims, Plaintiffs' counsel and certified public accountants reviewed the Supply System's books and records and interviewed its financial officers during the course of settlement negotiations. The Court acknowledges the strategic grounds for Plaintiffs' decision to undertake this settlement and accepts the validity of the monetary constraints perceived by the parties as well.[17]

---

**17.** The Court also observes that the contentions of the Supply System as to the unavailability of

The real value of this settlement, which was not announced until September 2, 1988, cannot be determined. To be assessed fairly, it must be put into the context of the litigation as it was at that moment. Trial was about to begin against a number of remaining principal defendants. The Supply System, and its impressive counsel, had been central to defense efforts throughout the litigation and in preparation for the trial. Removal of this important element at this critical time immeasurably burdened the remaining defendants, changed the entire focus of the ensuing trial, and vastly enhanced Plaintiffs' probability of success through prospects of additional settlements or a favorable verdict, and, perhaps most important, by promoting a *collectible* recovery.

The settlement also made 'live' trial witnesses available to Plaintiffs. Because of limitations on this Court's subpoena powers, Supply System personnel otherwise would have been unobtainable in Tucson, and could have testified only by satellite television transmission or through tedious courtroom recitations of prior deposition testimony. Either of those alternatives would have been extraordinarily costly to Plaintiffs.

Other terms of the settlement required the Supply System to assign to Plaintiffs all of its claims relating to the Bonds or to Projects 4/5 against any remaining defendant in MDL 551. This assignment provided Plaintiffs additional leverage in settlement negotiations with those remaining parties.

The Court recognizes that many individual Class Members have deplored the terms of this settlement. Virtually all of the individuals who wrote to the Court to express their views on the settlement based their comments on the letter sent to them by the Bond Investors Association. Relevant excerpts of that letter follow:

> [Y]our volunteer WPPSS 4 & 5 Bondholders Committee has been totally cut off by Chemical Bank from further financial support. We believe this action was taken by Chemical Bank to keep you from learning the ugly truth behind the MDL 551 settlement and how you have been sold short. Here are some of the things you will not be told when you are officially notified of the settlements and your rights thereunder:
>
> 1. The settlement with WPPSS itself was for no money. WPPSS agreed to a $2.25 billion judgement [sic] which is uncollectible. Chemical agreed to drop all efforts to move against project 1, 2 and 3 assets. WPPSS also agreed to drop its lawsuit against Chemical Bank for unauthorized use of confidential information which it obtained while acting as trustee. The net result of this settlement is:
>
>> a) WPPSS gets back its credit rating thereby opening the door to refinancing project 1, 2 and 3 bonds and reaping almost $1 Billion in interest expense reductions.
>>
>> b) Chemical Bank gets the lawsuit against it dismissed.
>>
>> c) Bondholders get nothing.
>
> How can Bondholders be expected to approve such a settlement? By not telling you these facts.

Obviously, a great deal of misunderstanding was generated by this letter. Many objecting letter writers seem to believe that the Supply System settlement either jeopardized, or should have resolved, claims that are currently being litigated in the action entitled *Bonneville Power Administration, et al. v. Washington Public Power Supply System, et al.*, C82–1252 (W.D.Wash.), often referred to as the "Cost Sharing" litigation. The claims being litigated in that action are explicitly unaffected by the terms of the settlement agreement,[18] however, and to the extent the let-

---

funds, though sometimes broadly and boldly challenged, were not shown to be invalid. Nothing persuasively suggested that the defendant's analysis was anything but proper, including the conclusory and unsupported contentions of one objecting class member, Nathaniel Grey, to the contrary. Chemical Bank, in papers responding to objections to these settlements, discloses that this objector's theory of recovery, as well as others advanced, was specifically contemplated and rejected.

**18.** The agreement does provide for reasonable cooperation by the Supply System in making present and former employees available to Chemical Bank for interviews, trial and the preparation of factual statements in connection with the Cost Sharing litigation.

ter implies otherwise, it is deceptive. Further, those claims were not litigated in MDL 551 and are not pertinent to a determination of the fairness of this settlement to the Classes.

The terms of this settlement make no reference whatsoever to the credit ratings of Project 1, 2 and 3 (or any other) bonds. If there has been any positive impact on bond ratings, or interest terms, as a result of the resolution of this litigation, it came as a by-product, and not as any part of this settlement. Such a consequence is, in any event, irrelevant to consideration of the fairness of the settlement to the Classes. The same is true of the Supply System's agreement to dismiss its Third Party Claim against Chemical Bank.

Objections to the Supply System settlement are also raised on behalf of a number of individuals and entities, referred to herein as "the Heerey Objectors," that currently hold in excess of twenty percent of the outstanding WPPSS 4/5 Bonds. For the most part, these objectors purchased their bond holdings after June 15, 1983, and are not, therefore, Class Members insofar as such purchases are concerned. Nonetheless, the Court permitted them to be heard at the Settlement Hearings and has fully considered their objections.[19] The group's specific objections to this and to other settlements have also been, and will be, considered to the extent they represent views that may be held by Class Members. The group's pertinent criticisms of the Supply System settlement are essentially the same as those the Court has already discussed and need not be addressed further.

Interpacific raises the same objections to the Bar Order provision in the Supply System settlement that it raised to that of Wood Dawson. For reasons discussed in connection with that settlement, its objections are without force in connection with the Supply System settlement, as well. The Court has already discussed several of the factors that the *Nelson* and *Nucorp* courts deemed important to an inquiry into the fairness of a settlement in connection with its assessment of the Supply System settlement. The strong possibility of the uncollectibility of any judgment, the uncertainties of establishing the System's liability, and the active participation of the independent Master in the settlement negotiations all provide evidence that the settlement is fundamentally fair and equitable. Counsels' experienced and informed determination of the improbability of any greater monetary yield further substantiates this finding. The Court finds the Supply System settlement to be in good faith and fundamentally fair and equitable sufficient to extinguish contribution claims based on federal law.

In view of the foregoing considerations the Court is also satisfied that the terms of the Supply System settlement fairly and adequately reflect this defendant's ability to pay and thus finds it reasonable under the circumstances and within the meaning of R.C.W. 4.22.060. Under the directive of that statute, the Supply System is discharged from any liability for contribution asserted as a result of any claims under state law. Under the circumstances, the Court finds that the settlement also meets the criteria of Fed.R.Civ.P. 23 that it be fair, reasonable and adequate.

## R.W. BECK AND ASSOCIATES

R.W. Beck and Associates ("Beck" or "R.W. Beck") was the consulting engineer for Projects 4 and 5. The firm, which was not sued by Chemical Bank, reached a settlement with Class Plaintiffs on September 5, 1988. The Stipulation and Agreement of Compromise and Settlement Between Class Plaintiffs and Defendant R.W. Beck and Associates, reflecting the terms of that agreement, was filed with the Court on October 7, 1988.

The terms of the Beck settlement call for a payment of $20,000,000, provided by insurance coverage, to the Classes. Like the previously discussed agreements of Wood

---

**19.** The Heerey Objectors' dispute really involves the representation of Chemical Bank as it relates to post-Class period purchases. Therefore the Court is not required to consider their objections in determining the fairness, reasonableness and adequacy of these settlements to the Classes. In the section of this Opinion entitled "Objections of Post–June 15, 1983 Bondholders," the Court considers these Objectors' challenges to the settlements.

Dawson and the Supply System, this settlement also calls for the entry of a Bar Order enjoining the prosecution of claims over. Other than the objection raised by the Institutional Investors to all proposed Bar Orders, no specific objections have been raised to this settlement.

Beck's involvement in the Projects included preparation of a report that was appended to the Official Statement in connection with each 4/5 bond issue. Beck also prepared some portions of the Official Statements and some analyses requested by the Supply System.

The Court had not decided its pending motion for summary judgment at the time Beck settled with Class Plaintiffs. In papers in support of that motion, Beck had propounded strong defenses to each of Plaintiffs' claims to demonstrate that its judgments had been reasoned, factually sound and made in good faith. Beck was prepared to offer expert testimony to support the reasonableness of its conclusions and to demonstrate that its reliance on others in areas outside its own expertise, had, likewise, been reasonable.

The previously described reasons for the Court's rejection of the Institutional Investors' opposition to all Bar Orders are applicable here. Additionally, the Court agrees that the personal assets of the partners of R.W. Beck are not sufficient to be considered for settlement purposes. Beck is a partnership comprised of individuals whose personal assets are limited. Class Plaintiffs and the Settlement Master reviewed financial statements of the individual Beck partners during settlement negotiations. The Court, likewise, has inspected those statements *in camera* in connection with its assessment of the fairness, reasonableness and adequacy of this settlement. The Court finds that the settlement amount provides the likely maximum amount available to satisfy any judgment that might have been rendered in this action against R.W. Beck and represents the only realistically collectible asset of the defendant.

In view of the foregoing considerations, the Court is satisfied that the settlement payment fairly and adequately reflects this defendant's ability to pay and finds it reasonable under the circumstances and within the meaning of R.C.W. 4.22.060. Under the directive of that statute, Beck is discharged from any liability for contribution asserted as a result of any claims under state law. The Court finds further that the Beck settlement was reached in good faith and is fundamentally fair and equitable sufficient to extinguish contribution claims based on federal law.

## CENTRAL ELECTRIC COOPERATIVE, INC.

Class Plaintiffs and Chemical Bank reached an agreement to settle their claims against the Central Electric Cooperative, Inc. ("Central Electric") immediately prior to the start of trial. Claims and proceedings against the defendant were stayed and severed at that time, and a memorandum of understanding of the terms of their settlement was filed with the Court. The Stipulation and Agreement of Compromise and Settlement Between Plaintiffs and Central Electric Cooperative, Inc., containing the final terms and conditions of their agreement, was filed on April 11, 1989.

This settlement calls for the defendant to pay $2,250,000 into an escrow account on behalf of Plaintiffs. In exchange for this payment, claims against Central Electric will be dismissed and released.

Central Electric held less than a one percent share in Projects 4/5, Like most other Participants it was not a member of the Supply System and it provided minimal information for the Official Statements. No specific objections have been raised to this settlement. The Court's analysis, under applicable standards, of the *Officers for Justice* factors regarding the general circumstances of these settlements fully supports a favorable decision with respect to this particular one. The Court finds that the terms and conditions of the Central Electric settlement are fair, reasonable, and adequate in accordance with the mandate of Fed.R.Civ.P. 23.

## CLALLAM COUNTY PUBLIC UTILITY DISTRICT NO. 1

During the first week of trial, Plaintiffs settled their claims against the first of a number of uninsured Participant Members

of the Supply System. The terms of that agreement are contained in the Stipulation and Agreement of Compromise and Settlement Between Plaintiffs and Defendant Public Utility District No. 1 of Clallam County, Washington, filed with the Court on April 11, 1989. An addendum to the settlement agreement making several minor corrections to its terminology was filed on May 17, 1989.

Clallam had slightly more than a 1.37% share in the Projects. The terms of its settlement involved a potential payment of $6,000,000 and assignment of the Public Utility District's interests in certain insurance policies, valued for purposes of the settlement at $521,750, to Class Plaintiffs and Chemical Bank. The settlement agreement provided for several potential reductions of the amount to be paid by Clallam in the event subsequent settlements of similarly situated defendants occurred and met certain conditions. The provisions were intended, among other things, to ensure comparability of this defendant's early settlement to agreements negotiated by similar, but later settling, defendants. The conditions established in the Clallam settlement agreement were met upon the later settlement of the Washington Public Utilities Group, and the monetary amount of the Clallam settlement accordingly required reduction.

Resolution of a dispute over the adjusted amount due under the terms of the settlement necessitated renewed involvement of the Settlement Master, and final accord was only recently reached. The final cash settlement sum, after agreed upon adjustments, is $4,750,000. The balance of that amount is due on September 13, 1989, after which interest will begin to accrue. The Court has carefully examined the terms and conditions surrounding the settlement of this Participant defendant. For reasons described in the sections that follow concerning the settlements of the Washington Public Utilities Group and Snohomish County Public Utility District, as well as for reasons discussed in regard to these settlements overall, the Court finds this settlement, and the amount thereof, to be fair, reasonable and adequate in accordance with Fed.R.Civ.P. 23.

## CITY OF RICHLAND

Plaintiffs reached a settlement with the City of Richland, Washington on the last day of opening statements of the trial, September 16, 1988. The terms and conditions of this agreement are contained in the Stipulation and Agreement of Compromise and Settlement Between Plaintiffs and the City of Richland, filed with this Court on November 2, 1988. The settlement requires the City, which was both a member of the Supply System and a Participant with a nearly two percent share in Projects 4/5, to pay $6,500,000 to Plaintiffs to settle the claims against it.

The Supply System is headquartered in Richland and it has a significant and substantial impact on the City's economy. The position taken by Richland in this lawsuit and in related actions illustrates the peculiar circumstances that have characterized this litigation. By resolution, Richland acknowledged its obligation under the Participants Agreements in May, 1982, and, like the Supply System, continued to urge the validity of those Agreements throughout the course of the *Chemical Bank* litigation in the Washington Courts and in the petition for review by the United States Supreme Court. The City arranged for funds to be maintained in an escrow account to pay amounts due under the Participants Agreements, although the Washington courts refused to allow release of the funds. Because evidence of these actions would have been harmful to some of Plaintiffs' claims, the City's presence as a defendant in this litigation was potentially damaging.

Additionally, the City's insurance proceeds were consumed in the course of the litigation and in partial payment of the settlement, and the ability of this municipal defendant, like others, to pay any larger judgment was arguably limited by statutory and economic and constraints.

For the foregoing general and particular reasons, the Court finds that the terms and conditions of the Richland settlement are fair, reasonable, and adequate in accordance with the mandate of Fed.R.Civ.P. 23.

## THE INDIVIDUAL DEFENDANTS

Individual Defendants is the collective term used to describe persons who served on the Board of Directors of the Supply System ("Director Defendants") or who attended meetings of the Participants' Committee ("Participants' Committee Defendants"). The terms of the settlement of Plaintiffs' claims against these individuals are contained in the Stipulation and Agreement of Compromise and Settlement Between Plaintiffs, Director Defendants and Participants' Committee Defendants, filed with this Court on October 11, 1988, and supplemented with amendments filed on October 27 and December 22, 1988. The agreement to settle and stay the claims against the Individual Defendants was substantially reached prior to the start of trial and these defendants were not actively involved in that forum.

The terms of the settlement require payment of more than $32,000,000 insurance coverage to Plaintiffs and the assignment of additional insurance rights or claims that the Individual Defendants might have. Every one of the Individual Defendants is encompassed within the terms of one of the utility defendant's settlements, which are also now before the Court.

Those Individual Defendants who served on the Supply System Board of Directors did so on a part time basis for little or no compensation. Meetings were held about once a month and were open to the public. Most Board members held other full time jobs. They made decisions regarding the hiring of experts and profess reliance on those persons' expertise as to the content of the Official Statements. Several purchased 4/5 Bonds. Participants Committee Defendants, like the Directors, served part-time and met monthly. They had little control over Supply System matters or policy.

The potential for a finding of liability against these Individual Defendants was the subject of a number of important decisions in this litigation. In late 1986, this Court ruled that official immunity shielded them from liability under both state and federal law and granted a motion for summary judgment on that basis. Order of December 22, 1986. After reconsideration, the Court modified the ruling and limited the cloak of immunity by finding a waiver thereof to the extent insurance had been purchased to indemnify the Individual Defendants from claims such as those asserted herein. Order of February 17, 1988. This settlement reflects the results of negotiations that followed that ruling.

The settlement payment represents the majority of insurance proceeds not consumed by defense costs. It provides a recovery that approaches the maximum amount available under the Order of February 17, 1988. Additional litigation would have consumed more of this coverage.

The Settlement Master participated in these negotiations, and the Court has every reason to believe the settlement was reached in good faith. The Court further finds the settlement was not the product of fraud or overreaching by, or collusion between, the negotiating parties.

The Court finds that the terms and conditions of the Individual Defendants' settlement are fair, reasonable, and adequate in accordance with the mandate of Fed.R. Civ.P. 23.

## THE CONSOLIDATED SETTLEMENT—WASHINGTON PUBLIC UTILITIES GROUP, KLICKITAT, FRANKLIN, MASON, STEILACOOM, ALDER MUTUAL, BONNEVILLE POWER ADMINISTRATION, AND STATE OF WASHINGTON

On November 1, 1988, a memorandum of understanding reflecting the terms and conditions of preliminary agreements among Class Plaintiffs, Chemical Bank, the Washington Public Utilities Group ("WPUG"), Public Utility District No. 1 of Klickitat County ("Klickitat"), Public Utility District No. 1 of Franklin County ("Franklin"), the United States of America on Behalf of Itself and its Agency, the Bonneville Power Administration ("BPA"), and the State of Washington ("State") was filed with this Court. At that time claims against WPUG, Klickitat, and Franklin were severed and proceedings against them were stayed. Claims against Public Utility District No. 1 of Mason County ("Mason"), the Town of Steilacoom ("Steilacoom"), and

Alder Mutual Light Company ("Alder"), then the only remaining non-member Participants in the MDL 551 litigation, had been severed from other claims on September 8, 1988, at the beginning of trial, pursuant to the parties' stipulation. Proceedings against them were stayed at that time.

The Stipulation and Agreement of Compromise and Settlement Between Plaintiffs and Washington Public Utilities Group, Public Utility District No. 1 of Klickitat County, Public Utility District No. 1 of Franklin County, Public Utility District No. 1 of Mason County, the Town of Steilacoom, Alder Mutual Light Company, the United States of America on Behalf of Itself and its Agency, the Bonneville Power Administration, and the State of Washington (the "Consolidated Settlement Agreement") was filed with this Court on April 6, 1989. That document contains the terms and conditions of settlements reached by Plaintiffs with each of the above-named entities.

The terms of these proposed settlements require pre-interest payments to Plaintiffs totalling $226,801,400.53.[20] Under the Consolidated Agreement, the cities and public utility districts comprising WPUG will pay $168,261,706.54 of that amount. Franklin will pay $9,360,000; Klickitat, $3,696,-322.21. Mason and Steilacoom will pay $250,000 and $232,371.78, respectively, and Alder will pay $1,000. BPA will pay $35,-000,000, and the State of Washington will pay $10,000,000.

For the reasons that follow, the Court finds the terms of these settlements, as contained in the Consolidated Settlement Agreement, to be fair, reasonable and adequate in accordance with the mandate of Fed.R.Civ.P. 23.

*Severability*

■ Paragraph 5 of the Consolidated Settlement Agreement, entitled "Escrow Terms" provides in part that

5.1 The Settlement Sum shall be paid into the Settling Parties' Escrow Accounts ... except that if any of the following occurs, then the amounts remaining in each Settling Party's Escrow Account shall be immediately returned to such Settling Party:

\* \* \* \* \* \*

(b) The Agreement fails to become Final for any reason, whether by:

(i) refusal of the *MDL 551* Court to enter an Order and/or Judgment approving this Agreement as fair, reasonable and adequate, and a timely notice of appeal is not filed;

The position maintained by counsel representing the parties to the Agreement, and the apparent thrust of this provision, is that, unless the Court approves every aspect of this Consolidated Settlement Agreement, every provision included within it will fail.[21] The result of this would be a return to litigation and resurrection of the associated risks, costs and hardships that have been described previously. The Court is not able, therefore, either according to the terms of the Agreement itself, or in accordance with the law, to select and retain acceptable provisions of the Consolidated Agreement and to reject or revise unacceptable ones. The district court is not empowered to rewrite a settlement agreed upon by the parties. *Officers for Justice*, 688 F.2d at 630. Deletion, modification or substitution of certain provisions is not permissible. *Id.* While modification may be suggested by the Court, the reality is that this Agreement represents the final product of an arduous and meticulous negotia-

---

**20.** The Class Notice listing and schedule of settlements includes the amount of the settlement with Snohomish County ($48,682,000) and reflects the total sum of settlements that were collectively negotiated by Class counsel ($275,-483,400).

**21.** A contrary conclusion is not dictated, insofar as the portion of the Agreement that deals with the contribution of the State of Washington is

concerned, by the provisions of Paragraph 20 of the Memorandum of Understanding or Paragraph 19 of the Stipulation and Agreement of Compromise and Settlement. Those provisions permit severance of terms applying to the State only if, after the State has appropriated funds for its settlement payment, an order dismissing the claims of the Class in the Washington state courts has not been obtained.

tion process undertaken by skilled and knowledgeable counsel, and any modification suggested by the Court would presuppose greater familiarity with the negotiating positions and process than it has. Thus, the Court must consider the proposed Agreement as a whole and determine whether, comprehensively, it is indeed fair, reasonable and adequate to the Class, justifying its approval, or whether some or all of those essential qualities have been sacrificed by its terms and require the Court to withhold approval. *See id.* and cases cited therein.

■ The Court is urged by its supporters to approve this Consolidated Settlement Agreement simply because the aggregate amount to be paid by its parties is clearly significant. While the Court does not dispute the significance of the combined amount of these settlements, both in isolation and in the context of relevant *Officers for Justice* factors, approval of the Agreement based solely on such reasoning, would be inappropriate. More than monetary terms affect the fairness, adequacy and reasonableness of the settlements embodied in this Consolidated Agreement, and just as the *Officers for Justice* factors have been applied in the assessment of each other defendant's settlement, they will be applied here. Thus, it is necessary to view and evaluate the separate component settlements while bearing in mind the need to achieve a comprehensive assessment of the fairness to the Classes of the Consolidated Agreement.

Certain aspects of this Agreement have been severely criticized and subjected to vehement objection. Virtually all of the opposition concerns terms that relate to BPA and the State of Washington. Except for general objections that have already been discussed, the Court is aware of no specific objections to the settlements reached between Plaintiffs and the utilities and cities whose terms are contained within this Consolidated Agreement. The Court begins its analysis with those entities' settlements.

*Washington Public Utilities Group*

The memorandum in support of the WPUG settlement was submitted on behalf of the settlements of Mason, Steilacoom and Alder, as well as the Washington Public Utilities Group [22]. Under the terms of the Consolidated Agreement, the 12 cities and public utility districts comprising WPUG, whose combined shares account for nearly 45% of Project capability, will pay $168,261,706.54. WPUG will receive from Plaintiffs the assignment of the proceeds of certain insurance policies and a portion of the net proceeds of others. These policies were assigned to Plaintiffs in connection with other settlements of this litigation. Klickitat will share in the proceeds of any recoveries under the policies and the utilities will bear the expense of prosecution of any of the wholly assigned policies.

Aside from any advantage derived from the previously described difficulties facing Plaintiffs in their need to establish liability under any of the applicable legal standards, the utilities and cities that comprise WPUG had available, and would have vigorously asserted, with the aid of expert testimony, many defenses in an effort to show the reasonableness of their actions in connection with their participation in Projects 4/5. While the Court has no intention of suggesting the outcome of litigation, had it continued, it is once again appropriate to observe that many factors contributed to the uncertainty of result that existed for all parties undertaking settlement negotiations.

Even if Plaintiffs had obtained a verdict against WPUG, significant obstacles would have faced them in satisfying a judgment. No appreciable insurance was available to the WPUG utilities for liability that might have been found, and only two entities had any coverage, much of which was being depleted in defense costs. Under Washing-

22. The WPUG is composed of PUD No. 1 of Benton County, Washington; PUD No. 1 of Clark County, Washington; PUD No. 1 of Cowlitz County, Washington; PUD No. 1 of Grays Harbor County, Washington; PUD No. 1 of Lewis County, Washington; PUD No. 3 of Mason County, Washington; PUD No. 1 of Okanogan County, Washington; PUD No. 2 of Pacific County, Washington; PUD No. 1 of Skamania County, Washington; PUD No. 1 of Wahkiakum County, Washington; and the Cities of Tacoma and Ellensburg, Washington.

ton law, enforcement of a judgment against the municipal corporations that WPUG includes would have been difficult, drawn out and subject to defenses that would have delayed and threatened collectibility. These considerations foster a favorable determination of the utility group's sizable monetary settlement.

Additionally, these utilities faced pressures and risks, separate and distinct from those associated with the litigation itself, that encouraged settlement and presumably enhanced the sum that was agreed to. The potential for a finding of joint and several liability after a trial, and the severe impact it could have had on the region's public power scheme impelled this major defendant group toward settlement. Similarly, a termination of the extraordinary monetary and personnel costs of the litigation prompted the utilities to regard compromise as a desirable object.

Many of these same considerations are relevant to the settlements of Mason, Steilacoom and Alder. Mason and Steilacoom, each holding Project shares of about .15 of one percent (.00156 and .00145) will pay $250,000 and $232,371.78 respectively. Alder, with slightly over a one-tenth of one percent share (.00011), will pay $1,000. These utilities are quite small and have a combined total of only about 6000 ratepayers. Each had a small Participant share in the Projects and a minor role in the undertaking. Because none was a member of the Supply System, the reasons accompanying the Court's approval of the settlements of other Non–Member Participants are also fully applicable to them.

The Court finds that the terms and conditions of the WPUG, Mason, Steilacoom and Alder Settlement are fair, reasonable, and adequate in accordance with the mandate of Fed.R.Civ.P. 23.

*Franklin*

Franklin Public Utility District settled Plaintiffs' claims against it for $9,360,000. Franklin, a Member Participant held a share of almost three percent of the capacity of Projects 4/5. Insurance proceeds were not available to the utility district to pay this sum. For many of the reasons mentioned in connection with the WPUG

settlement, in addition to the general factors that support all, the Court finds that the terms and conditions of the Franklin settlement are likewise fair, reasonable, and adequate in accordance with the mandate of Fed.R.Civ.P. 23.

*Klickitat*

The terms of the Consolidated Settlement Agreement require Klickitat, which held approximately a one percent Participant's share in the Projects, to pay $3,696,-322.21 to Plaintiffs in settlement of their claims. Scrutiny of several somewhat unique circumstances of this defendant under the *Officers for Justice* factors engenders an especially favorable opinion by the Court of this Participant's settlement. Like many other defendants, Klickitat will not pay its settlement sum with insurance proceeds. Klickitat bore the entire expense of its litigation costs in this lawsuit and was represented throughout by one attorney. The amount of its settlement approaches nearly fifty percent of the utility district's annual sales revenue. Clearly, the ability of this defendant to meet a larger judgment is doubtful.

Additionally, the strength of Plaintiffs' case against Klickitat was diminished because it, much like the City of Richland, had not challenged its obligations under the Participants' Agreement in the *Chemical Bank* litigation. Klickitat's continued presence at trial would have posed significant problems, in particular, to Plaintiffs' allegations of conspiracy and could have frustrated any attempted showing of generalized bad faith.

The Court finds that the terms and conditions of the Klickitat settlement are fair, reasonable, and adequate in accordance with the mandate of Fed.R.Civ.P. 23.

*Bonneville Power Administration*

In order to obtain a proper perspective on Plaintiffs' settlement with BPA, it is essential to review the history of the involvement of this agency of the United States in this litigation. BPA was sued in 1984 by both Chemical Bank and the Class Plaintiffs under the Federal Tort Claims Act, 28 U.S.C. § 1346(b). Plaintiffs alleged that BPA had negligently participated in

the planning, financing and oversight of Projects 4 and 5. The claims were dismissed in early 1986 when the Court found the discretionary functions that were the subject of the allegations to be shielded from claims of negligence. Order of January 24, 1986. Plaintiffs were permitted to amend their allegations to urge that construction oversight and financing activities of BPA were outside the agency's authority and were thus not exempt from negligence claims. Upon renewal of BPA's motion to dismiss the claims asserted against it, the Court was unable to conclude that BPA's interpretation of its authority was unreasonable. It found further that BPA did not exceed its authority. The Court was obliged once again to dismiss the claims, removing BPA from the MDL 551 litigation arena. Order of October 21, 1987.

Separate claims have been lodged against BPA by several MDL 551 defendants in the United States Claims Court. These cases have been stayed pending the outcome of MDL 551. Additionally, there exists some potential for claims for contribution or damages against the agency.

The terms of the BPA settlement are contained in the Consolidated Settlement Agreement. In exchange for the $35,000,000 settlement amount to be paid under the proposed settlement, BPA will receive a release of the Claims Court actions, of all claims which were or could have been asserted against it arising out of events that are the subject of MDL 551, and of certain related actions. Like other defendants, it will be indemnified by Plaintiffs against claims, cross-claims and claims-over.

Many objections have been raised to this settlement. The Bond Investors Association addressed the BPA settlement in its previously-described communication to its member Bondholders. The Association said the following about BPA and the proposed settlement with it:

> When Judge Browning released the Bonneville Power Authority [sic] (BPA) from the suit, he indicated there was evidence of culpability on the part of BPA in this default but that the law gave BPA immunity. In fact, the arguments by the defendants and the discovery proceedings show that the BPA, more than any other participant in the WPPSS debacle, was the most responsible party. Judge Browning advised Bondholders to seek other remedies, i.e. a special bill from Congress that would allow Bondholders to sue BPA. The BPA is not only one of the most guilty parties in the WPPSS fiasco, it is also financially the most able to pay a damage award.

> Chemical Bank was requested to support such an effort by your Bondholders Committee and indicated they thought it a good idea. They asked, however, that this effort be begun only after MDL 551 was over so as not to undermine the legal arguments in that case. Instead, you are now being asked to give up any rights to pursue the BPA for a $40 [sic] million settlement, payable over time and subject to various deductions for expenses still to be incurred. Clearly the opportunity to pursue the BPA after Judge Browning's opinion was a good one and should be pursued by Chemical Bank.

> While agreeing to the settlements [with WPPSS and BPA], Chemical Bank still has an ongoing cost sharing suit against the BPA involving the unauthorized use of over $400 million of project 4 and 5 monies for project 1 and 3 expenses that were judged to be of mutual benefit. This suit represents a major source of recovery for Bondholders but has been put on hold by Judge Browning pending the completion of MDL 551. When Chemical Bank was asked by your representatives why they did not make the MDL 551 settlements with WPPSS and the BPA conditional to a favorable settlement of the cost sharing suit as well, they replied "We chose not to". What kind of an answer is that to give Bondholders? A drop dead answer.

> The bank in effect opened the door to WPPSS and the BPA reaping almost $1 billion in interest savings without using this as leverage to force an agreement for getting the Bondholders back their $400 million with interest. Bondholders thus face various uncertainties as to when and how much of this money they

will ever get back, as well as ongoing litigations expenses. All this could and should have been avoided, instead BPA and WPPSS were both let off the hook for little or no cost.

In papers submitted on behalf of its Bondholder members, the Association raises similar, though less strident, objections. In both documents, the Association misconstrues the language of the Court's Order dismissing the claims against BPA. The Court did not intend to indicate that there was *evidence* of culpability on the part of BPA when it dismissed the claims against the agency. The Court did observe, after noting personal reluctance at having to dismiss the claims prior to factual development of the issues, that the *unproven allegations* reflected a strong, lengthy and forceful federal presence in Projects 4/5. Order of October 21, 1987 at 18.[23]

Thus, the characterization in the Bond Investor Association letter of the Court's observations as having been an indication that there was "evidence of culpability" was a distortion of those comments. In isolation, perhaps, no particular significance would attach to this misrepresentation.[24] However, because this disparaging and agitating letter, rather than the far more factual and detailed Class Notice, or the Court's Order itself, became the primary source of information relied upon by its many recipients, the Court is obligated to take exception to its misleading contents.

Many, many of the letters received by the Court as a result of the Bond Investor Association communication adopted or adapted this misstatement. Many writers expressed belief that the agency had been "found guilty" but was relieved of liability. Others saw the Court's recommendation of congressional involvement in the WPPSS matter as a mandate, absent which settlement should be prohibited. Neither impression is valid. Under the law, the agency is granted certain immunities. This is not the proper forum to discuss the merits of such legal protections. They exist. Because of these legal protections, the Court took the action it perceived necessary when it dismissed the BPA. That was, and is, its proper role.

No presumption of BPA's "guilt" will be employed in assessing this settlement. The Association's statements that BPA was "the most responsible party" and "one of the most guilty parties" in this tragedy are, like its statements concerning the Court's comments, unsupported, irresponsible and misleading. Few writers of letters to the Court showed any real understanding of the limited role of BPA in Projects 4 and 5.

Similarly, no caveat attached to the Court's suggestion regarding the pursuit of congressional relief. None will be implied in its assessment of this settlement. Chemical Bank was under no legal obligation to take that costly, time-consuming and uncertain avenue, either in addition to, or in lieu of this settlement.[25]

Nor will the Court give undue weight to the superior financial ability of the BPA, compared to other defendants in this action, to pay a damage award. In view of the Court's determination of the agency's immunity for its alleged actions, and the dubious possibility of obtaining any judgment as a result, a disproportionate monetary contribution would not be justified.

The remaining (and indeed many of the foregoing) objections of the Bond Investors Association pertain to actions of Chemical Bank that the Association and its bondholding members criticize. The objections appear to be largely unfounded and are, at best, irrelevant to the Court's determination of the fairness, adequacy and reasonableness of the settlement to the Classes. There is no legal reason why BPA's settlement of MDL 551 should be held hostage to

---

**23.** Similarly, arguments made by counsel did not "show" any ultimate responsibility on the part of BPA. They merely urged such a conclusion.

**24.** The Court observes that the Bond Investors Association is neither a Class Member nor a party to this litigation, and neither its letter to Bondholders nor its objecting papers were signed by Counsel.

**25.** The Court notes that the Chemical Bank did, in fact, explore the possibility of obtaining relief through legislation.

resolution of the "cost-sharing" litigation, for example, as the Association appears to suggest. That totally separate action involves allegations that are quite different from the ones proposed to be settled at this time. That action, along with its potential benefit to Bondholders, is explicitly preserved under the terms of the BPA settlement, and all others, in any event.

Consideration of the pertinent *Officers for Justice* factors involves recognition that this proposed settlement payment is among the largest of all of settlement sums in this action. The allegations against BPA involved charges of negligence, not fraud. The Court is aware that there existed a possibility that its dismissal of these allegations might have been appealed upon final judgment. The delay, expense and legal obstacles inherent in such a pursuit, though perhaps not insurmountable, would be formidable, and the risk of achieving any degree of success, great. The proposed settlement properly contemplates these considerations. The $35,000,000 settlement sum is commensurate, therefore, with this party's alleged role in the action and with any likelihood of success associated with pursuit of the dismissed claims. The sum is both reasonable and adequate.

Interpacific objects to this settlement's provision for a Bar Order as it has to others. Its objections are without merit here, for the previously discussed reasons. The *Nelson* and *Nucorp* inquiries provide evidence that the settlement is fundamentally fair and equitable, given the strong possibility that no judgment would have been entered against BPA even on appeal, due to the uncertainties of establishing its liability. The amount to be paid under the terms of the Consolidated Settlement Agreement is reasonable, as well, under the standards of R.C.W. 4.22.060. The experienced and informed involvement of counsel, combined with the active participation of the Settlement Master in negotia-

tions, further substantiate these findings. Finally, the Court believes that the public interest will be best served through the resolution of any remaining controversy. *Accord The Utility Reform Project v. BPA*, 869 F.2d 437, 443 (9th Cir.1989).

The Court finds that the terms and conditions of the BPA settlement are fair, reasonable, and adequate in accordance with the mandate of Fed.R.Civ.P. 23; that the settlement was reached in good faith; and that it is fundamentally fair and equitable sufficient to extinguish contribution claims based on federal law.

*The State of Washington*

The State of Washington is not a party in MDL 551. The State is, however, defendant in a suit pending in the State of Washington entitled *Hoffer v. State of Washington*, King County Superior Court No. 84–2–16459–0. The scope of the plaintiff class in that action is identical to that of the Classes in MDL 551.[26] In the *Hoffer* action, Plaintiffs are represented by different attorneys from those representing Plaintiffs in MDL 551.

As part of this Consolidated Settlement Agreement the State has agreed to pay $10 million in exchange for the release of Plaintiffs' claims against it in the *Hoffer* action. The Court's approval of the State's settlement with Class Plaintiffs is sought as a condition of settlement of claims in MDL 551 under the Consolidated Agreement.

Notice of the proposed release of the claims against the State was provided to Class Members in the Settlement Notice. The Notice contained a description of the Hoffer action and an explanation that approval of the proposed settlement would mean that "all Class Members shall be deemed to have released the State and its elected and appointed officials[ ] from any and all liability arising out of occurrences which are the subject of MDL 551 or Related Actions ... including *Hoffer et al. v.*

---

**26.** Proof–of–Claim procedures such as those undertaken in MDL 551 were not undertaken in the *Hoffer* action. As a result, some members of the MDL 551 Pre–Termination Class are potentially barred from sharing in this recovery. Thus, there presently exists a discrepancy be-

tween the number of Class Members in the two actions. However, this Court will continue to consider applicants' reasons for failing to submit Proof-of-claim forms by the previously set deadline and will determine whether good cause existed for the oversight.

*State of Washington."* Notice of Settlements and Settlement Hearings, at 7 n. 23. The Notice went on to advise Class Members that "[c]ounsel for the Hoffer plaintiffs has taken the position that MDL 551 counsel have no right to settle with the State, and that the $10 million payment by the State in MDL 551 is inadequate." The Court believes that this was a clear and adequate disclosure of the proposed settlement of claims against the State and that it provided Class Members with sufficient opportunity to object.

Few, if any, objections were received by the Court in direct response to the Class Notice. Objections to this settlement between Class Plaintiffs and the State of Washington derive almost exclusively from two sources. The primary objections are raised by counsel in the *Hoffer* action on behalf the *Hoffer* Class Representatives, who differ from the Class Representatives in MDL 551, but who are Class Members in the MDL action. A second group of objections stem from the Bond Investor Association letter that has been discussed previously.

The *Hoffer* attorneys object to the Agreement's resolution of claims that were neither raised nor litigated in MDL 551, first contending that MDL Class Plaintiffs do not have authority to settle the claims of the *Hoffer* Class Plaintiffs against the State because the former have only been certified to represent the class on its claims against the defendants in MDL 551.

■ There exists adequate authority upholding the ability of settling parties to release or resolve claims that are not before the Court. *See, e.g., Oswald v. McGarr,* 620 F.2d 1190, 1198 (7th Cir.1980). State law claims that the federal court does not have power to adjudicate may be released over the objection of Class Members. *In re Corrugated Container Antitrust Litigation,* 643 F.2d 195, 221 (5th Cir.1981), *cert. denied,* 456 U.S. 998, 102 S.Ct. 2283, 73 L.Ed.2d 1294 (1982). The fact that the State was not a party defendant in MDL 551 will not be deemed fatal to the settlement of Plaintiffs' claims against it, provided the Court is otherwise able to determine that the agreement is fair, adequate and reasonable in providing

for those claims. *See Weinberger v. Kendrick,* 698 F.2d 61, 77 (2d Cir.1982), *cert. denied,* 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983). It is not decisive that MDL Class counsel could not, without obtaining jurisdiction over the State for that purpose, *litigate* the *Hoffer* claims in this federal court. The issue here is whether MDL 551 Class Counsel may *release* those claims on behalf of the Plaintiff Classes, which comprise the same persons and/or entities in both actions. It is of no particular significance that the Class Representatives in the two actions differ. All are Class Members in MDL 551. The Classes, and the scope of claimants, coincide. This situation differs, therefore, from that in *National Super Spuds, Inc. v. New York Mercantile Exchange,* 660 F.2d 9 (2d Cir. 1981), where the reviewing court proscribed a settlement in which claims held by a *portion* of the class were to be settled for no consideration. The Court will not conclude that counsel in MDL 551 lacked authority to negotiate settlement of the Class claims against the State of Washington, regardless of where those claims reposed. The law does not dictate a contrary conclusion.

■ *Hoffer* counsel also contend that this Court lacks jurisdiction over the State and that it cannot, therefore, approve a settlement that releases claims not before it for adjudication. Counsel for the State of Washington, however, have taken part in settlement negotiations, entered into the Consolidated Settlement Agreement, prepared and submitted to this Court memoranda in support of its participation in this Consolidated Settlement, and appeared before this Court to urge and defend the Court's approval of the settlement. Through the Consolidated Settlement Agreement they seek entry of this Court's Order of approval. These actions unequivocally indicate the State's consent to this federal court's jurisdiction over this aspect of its litigation. Thus, insofar as the Court's approval of the settlement agreement between the Class Plaintiffs and the State of Washington is concerned, and despite the Court's lack of power otherwise to adjudicate these claims, a limited waiver of

**1414**

the State's Eleventh Amendment immunity is deemed to have occurred in the context of this litigation. *See TBK Partners, Ltd. v. Western Union Corp.*, 517 F.Supp. 380, 388 (S.D.N.Y.1981), *aff'd*, 675 F.2d 456 (2d Cir.1982).

■ A third objection raised by *Hoffer* counsel involves the charge that the MDL counsels' presentation of this Consolidated Settlement Agreement violates principles of comity. This Court has been presented with an agreement that, through counsel properly before the court, proposes resolution of claims of persons, also properly before the Court, that are pending elsewhere. Counsel for *these same Plaintiffs* in a separate action resist these efforts. Plaintiffs cannot have it both ways. This Court neither wishes to meddle, nor to intrude in the State court's affairs. It must, however, focus on the terms of the Consolidated Settlement Agreement before it and determine, on behalf of the persons the agreement involves, whether it fairly and adequately provides for them. Although the claims in the Washington Court must be appraised as part of this Court's assessment, and will be released if the agreement is approved, there will be no adjudication on the merits, just as there has been none in connection with any of the other proposed settlement agreements. The Court is not, therefore, intruding into the State's affairs.

■ In addition to the preceding objection, Class Plaintiffs' counsel in *Hoffer* also contend that the Court's approval of this settlement would violate the Anti–Injunction Act, 28 U.S.C. § 2283, because the practical effect of the Agreement's consummation would be to enjoin further prosecution of the *Hoffer* action in Washington courts.[27] Approval of the Consolidated Settlement Agreement would, the court recognizes, release Class Plaintiffs' claims against the State of Washington. That is indeed the intent of the Agreement. The Anti–Injunction Act is no more a barrier to

the Court's approval of this agreement than it would be to any other where further litigation of claims in related actions pending in state courts are circumscribed, through collateral estoppel or *res judicata*, as an outcome of settlement. Such effects are common. The state court action would not be restrained by approval of this Agreement; it would be resolved. The Act is simply not implicated.

The remainder of the *Hoffer* objections to the State's involvement in the Consolidated Settlement Agreement concern the settlement process and the terms of the agreement itself. First, they assert that the settlement process was improper. The Court agrees that the negotiation process that led up to the State's participation in this Consolidated Agreement was, indeed, unusual. However, neither that departure from normal procedures (whatever they may be) nor the *Hoffer* objectors' interpretation of the negotiation process renders either the process or the settlement amount unacceptable.

In pursuit of an acceptable compromise in any bargaining process, there are a multitude of ways to fill the gap between monetary amounts specified. One way is through movement of one or both of the negotiating participants' stated target figures. Though it may be assumed that this occurred in other settlements in this action, ultimate compromise and settlement did not occur here in that fashion. Class Plaintiffs' MDL counsel proposed to obtain a combined total of $275 million[28] from the group of negotiating MDL defendants in exchange for settlement of the claims against them. Just as they had rejected an earlier demand for a higher sum, the negotiating defendants declined or were unable to meet this figure. Defendants used their bargaining powers in this instance, however, not in an attempt to depress Class Plaintiffs' asking price toward their own valuation of the claims' resolution, but to

27. The Act provides: A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or

effectuate its judgments. 28 U.S.C.A. § 2283 (1978).

28. This figure includes the amount plaintiffs contemplated for settlement of claims against the Snohomish group.

induce the State of Washington to contribute to the consolidated settlement sum, thereby meeting Plaintiffs' monetary demand.

It is not necessary for this Court to inquire into the reasons that may have lain behind defendants' choice of that path. The Court is required to review only the legal aspects and effects of the chosen course of action. Initially it can determine that no inference is warranted, based on the foregoing, that negotiations between the State and the Plaintiffs were *not* conducted at arms' length. There is certainly no suggestion of collusion between Class Plaintiffs and any of these settling parties, and the Court is not required to question the amount of discussion or appraise the quantity of contact in order to assess the propriety of negotiations. Indeed, such aspects of negotiations are generally unknown to the approving court. Based upon all information available, including depositions of the three primary negotiating parties, this Court is convinced that the discussion process that resulted in the Consolidated Settlement Agreement was not unlawfully tainted. It clearly appears to have been, rather, the product of skillful, indeed shrewd, negotiation on all parts.

The exclusion of *Hoffer* counsel from the process, while perhaps perceivable as an insult, is likewise not a fatal flaw, if indeed it is a flaw at all. The myriad of factors that contributed to the dynamics of these settlement negotiations necessitated a number of difficult decisions. Exclusion of *Hoffer* counsel was but one. The opinion cited by these objectors, *In re General Motors Corp. Engine Interchange Litigation*, 594 F.2d 1106 (7th Cir.1979), *cert. denied*, 444 U.S. 870, 100 S.Ct. 146, 62 L.Ed.2d 95 (1979), is not apposite in that it concerned settlement negotiations conducted on behalf of only *some* of the plaintiffs in an action. Here, all Class Plaintiffs were represented and it must be presumed that their best interests were paramount in the negotiations.

The next series of objections from the *Hoffer* counsel pertain to the terms of the settlement itself. They contend that the State's contribution to the Consolidated Settlement inadequately compensates Plaintiffs for the damages alleged in the *Hoffer* action and that the State's participation in the Consolidated Settlement is thus unfair and unreasonable. A determination of the fairness, adequacy, and reasonableness of the State's settlement requires the Court to evaluate the *Hoffer* action, just as it has assessed the strengths and weaknesses of the circumstances surrounding the MDL 551 defendants' positions. MDL Class counsel were required to make a similar evaluation in connection with their decision to settle the *Hoffer* action, as they had done on a continuing basis throughout this litigation. The *Officers for Justice* factors provide the appropriate tools for the Court's analysis.

Like those in MDL 551, many of the claims in the *Hoffer* action are based on allegations of misrepresentation, and many of the same considerations apply. However, the *Hoffer* action is directed at the Washington State Auditor. The surviving allegations involve charges that the Auditor negligently performed or failed to perform statutory duties, that his letter and certification of the WPPSS 4/5 bonds contained fraudulent and/or negligent misrepresentations, that the State's participation in the Supply System's decision to terminate the two projects constituted tortious interference with the contractual relations between the Supply System and the Bondholders, and that the State is both primarily and secondarily liable for untrue statements. These claims belong to the Class Plaintiffs. MDL Counsel, on behalf of these Plaintiffs, reached an informed judgment in the course of settlement negotiations that the claims should be released in exchange for the sum obtained from the State.

In their papers concerning the State's settlement of the *Hoffer* claims, the State, MDL and *Hoffer* counsel all make forceful arguments regarding the strength or weakness of these claims. Because the Court recognizes the uncertainty of the outcome had litigation been pursued, however, it cannot and will not attempt to reach any ultimate conclusions concerning the contested issues of fact and law underlying

the merits of the *Hoffer* dispute. *See Officers for Justice*, 688 F.2d at 625.

Nonetheless, it is appropriate to observe that these claims have survived only a motion for dismissal under Washington Rule CR 12(b)(6), according to which a complaint can be dismissed if it fails to state a claim upon which relief can be granted. The State Supreme Court reinstated eight of the nine claims dismissed by the lower court after finding that the State had not shown that there was no conceivable set of facts under which Class Plaintiffs could prove their allegations. *Hoffer v. State of Washington*, 110 Wash.2d 415, 755 P.2d 781 (1988), *aff'd on rehearing*, 113 Wash.2d 148, 776 P.2d 963 (1989). The merits of the claims have not been subjected to motions for summary judgment, or to trial. Extensive discovery has not been conducted.

The risks, expenses, and difficulties associated with further litigation of this lawsuit, were it to continue, are, not unlike those that were actually experienced in MDL 551, enormous. Class Plaintiffs would, of course, bear those expenses if they were to prevail, and the length of time required before any judgment, or separate settlement, could be reached is incapable of estimation. Certainly, it is not unrealistic to assume that either would require a number of years. Little advancement has occurred in the action as yet.

Relying on their own appraisal, *Hoffer* counsel contend that the amount of damages potentially available in their action far exceeds the amount of this proposed settlement and could, in fact, surpass the amount recoverable had MDL 551 gone to a verdict favorable to the Class. Their opinion, however, relies on a number of tenuous and untried hypotheses that would require, among other things, survival of uncertain claims and favorable legal decisions throughout. There is no reason to assume that the State would not aggressively attack, and plausibly defeat, efforts to maintain this posture. Furthermore, the opinion of MDL Class counsel—that the proponents' valuation of the *Hoffer* claims has been exaggerated—is particularly meaningful since they made recurring appraisals of the value of such an action.

The Court recognizes that MDL counsel fully comprehend the damages issues inherent in *both* actions and values their judgment on these matters.

*Hoffer* counsel also make light of provisions in other settlement agreements in this action that would require Class Plaintiffs to provide a defense if the State were to bring third-party claims against settling MDL defendants in connection with the *Hoffer* action. This requirement would necessitate reservation of a portion of the Settlement Fund derived from other MDL settlements. Additionally, a portion of these funds might be necessary to make indemnification payments for amounts that could be assessed against those defendants. Plaintiffs would essentially be required to fund themselves with settlement money. Thus, there is more value to Class Members in resolving the *Hoffer* claims than might appear viewing the settlement amount in isolation.

More significantly, perhaps, any total damage award for the torts alleged in the *Hoffer* complaint would be subject to reduction for damages found to be caused by MDL defendants. Thus any aggregate recovery that might be attained for Plaintiffs' damages would be offset by the amount of the MDL settlement payments. *Hoffer* counsel point out that an assessment of liability against the State alone would preclude the need for such an offset, but the Court observes that the path to such a decision would be replete with risks that warrant a more conservative point of view.

Counsel for Class Plaintiffs in the *Hoffer* action also urge that the State of Washington has virtually unlimited ability to satisfy a judgment or settlement and is not constrained, as are some MDL defendants, by the threat of bankruptcy. Although this may be true, and has some bearing on the State's settlement contribution, it is persuasive of nothing. The same argument could be made, though it would be less likely, if the instant settlement were for ten times the amount. It sheds no light on the fairness, adequacy or reasonableness of the State's contribution. The Court

is not unmindful of the disparity between Class Plaintiffs' losses and the recovery in these settlements. It does not automatically follow, however, given the nature of these claims, that any recovery amounting to less than full reimbursement is unacceptable. Nor is it proper to assume that, because the state is more able to pay, it should therefore pay more.

Nor do *Hoffer* counsels' urgings that the State's $10 million is a mere "nuisance" payment persuade the Court of its inadequacy. The fact that the State estimated that it might expend an equivalent amount defending the *Hoffer* lawsuit, which it contends is meritless, may well have been a factor in its decision to oblige Class Plaintiffs' pursuit of that amount at this early stage of the litigation. Combined with other advantages provided by settlement, including increased bond ratings and the more generalized "peace" sought by all litigants, the State can hardly be faulted for choosing to conclude its involvement early—perhaps at a price dearer than what it might later have paid. It is in the nature of compromise that some things are relinquished and others derived.

Many objections to this settlement also arise from the Bond Investors Association letter that has been described previously. Relevant comments from that communication follow:

> In the final settlement proposals the State of Washington, who was not even a defendant in MDL 551, came in with a $10 million contribution in return for Chemical Bank dropping the Hoffer Action being brought by the WPPSS Bondholder Committee against the State in state court. This was done by Chemical Bank without even consulting your committee who was opposed thereto.
>
> This suit represents a major avenue of recovery for Bondholders. The State's inclusion in the MDL 551 settlement and Chemical Bank['']s agreement thereto is outrageous and totally incomprehensible. *We believe Chemical Bank should be called to account by Bondholders to explain how they can spend millions of dollars of your funds in bringing the action against Washington State and then agreeing to drop it for a settle-*

> *ment that will net Bondholders less than half a cent per dollar of loss.*

The letters that came to the Court from Class Members and Bondholders reiterated these assertions. The Court has already addressed the substance of the objections to the terms of the settlement that appear in the letter. It will consider the letter's criticisms of Chemical Bank's representation subsequently.

The Court does not agree that $10 million is too little for the State to pay to resolve Class Plaintiffs' claims against it. Objectors' comments that the State has a "moral obligation" to pay more lack potency and legal underpinning. On the facts and information before it, the amount appears to be fully adequate, and the Court finds the terms of the Consolidated Settlement Agreement that apply to the State to be fair and reasonable to Class Plaintiffs in accordance with the mandate of Fed.R. Civ.P. 23.

SNOHOMISH COUNTY

On November 10, 1988, Class Plaintiffs, Chemical Bank and Public Utility District No. 1 of Snohomish County, Washington ("Snohomish") reached agreement to settle the claims in this action and Snohomish was stayed and severed from continuing litigation. The terms and conditions of their agreement are set out in the Stipulation and Agreement of Compromise and Settlement Between Plaintiffs and Public Utility District No. 1 of Snohomish County, filed on April 12, 1989. The parties' Letter Agreement of November 10, 1989, as amended on November 17, 1989, delineates the terms of their agreement, which include payment of $48,682,000 by Snohomish in exchange for release of Plaintiffs' claims, and payment of $2,682,000 by Plaintiffs to release their obligation to assign their interest in certain insurance policies that were to be assigned to Snohomish under the terms of the Consolidated Settlement Agreement.

Public Utility District No. 1 of Snohomish County had the largest single Participant's share in the WPPSS 4/5 Projects— slightly more than thirteen percent. Many of the same considerations apply to this

district's settlement as to those of the defendants reflected in the Consolidated Settlement Agreement. Settlement of Plaintiffs' claims against Snohomish was indisputably a goal of the negotiations that led to that Consolidated Agreement, and the memorandum of understanding that preceded it contained a provision under which Snohomish was given the right to settle with Plaintiffs on the same general terms contained therein. Under that memorandum, settlement with Snohomish after November 10, 1988 for an amount less than $58,729,500 would also have required Class Plaintiffs to reduce the amounts of the settlements agreed to by the WPUG and Klickitat defendants. Thus, approval of the adequacy of the amount of this settlement cannot be viewed in isolation.

In support of its settlement, Snohomish urges almost exclusively that the amount recovered by Plaintiffs through these settlements exceeds any amount that could have been recovered as a result of trial under arguably applicable legal principles. The Court has previously noted the difficulties facing Plaintiffs in proving that actions of these defendants caused their losses. It has discussed potential limitations on the measure of damages if liability were found. It remains convinced that counsel recognized and weighed these crucial considerations in arriving at their agreements to settle, and it values their experience and views. No specific objections have been received to this settlement, and the Court is of the opinion that it is fair and reasonable, in accordance with the applicable *Officers for Justice* factors and under the mandate of Fed.R.Civ.P. 23, and that it adequately compensates the Class for losses that may have been ascribed to this defendant in this action.

## UNITED AND EBASCO

Settlement of all the participant utility defendants left only several "professional" defendants in the trial arena. Trial went into a month-long recess beginning Thanksgiving week. During the recess, Class Plaintiffs reached settlement agreements with the remaining defendants. On November 28, 1988, the Court ordered the stay and severance of United Engineers & Constructors, Inc. ("United") and Ebasco Services Incorporated ("Ebasco"). The terms of the agreement between Plaintiffs and these two defendants are contained in the Stipulation and Agreement of Compromise and Settlement Between Class Plaintiffs, Chemical Bank, as Trustee, and Ebasco Services Incorporated and United Engineers & Constructors, Inc., filed on February 28, 1989.

This agreement requires these two architect/engineering firms to pay the Class $22 million.[29] In addition, Class Plaintiffs will obtain fifty percent and seventy-five percent shares, respectively, of proceeds, if any, recovered from two insurance policies that Ebasco is currently litigating in the United States District Court for the Northern District of Texas/Dallas Division. Each of these policies has a face value of $25,000,000. Exemplary damages are also sought in the Texas insurance litigation. Ebasco has guaranteed payment of at least $3 million to the Class if an equivalent recovery is not obtained as a result of the insurance litigation.

United and Ebasco were the architect/engineers for Projects 4 and 5, respectively, over different periods of time. The firms provided construction management for the Supply System and prepared annual estimates of certain construction costs. Neither firm was sued by Chemical Bank in this litigation, although the Supply system assigned its claims against United to Chemical and Class Plaintiffs as part of its own settlement agreement.

Class Plaintiffs' allegations against these firms did not involve all of the types of misrepresentations and omissions described in this Order. These professional defendants were not charged with having made misrepresentations regarding the authority or willingness of the Participants to enter and honor their agreements, the need for power, or the risk of termination of the

---

**29.** This sum will be paid as follows: $14,833,-333.33 by United and its insurer and $7,166,-666.67 by Ebasco.

Projects due to an inability to finance. Much of the evidence presented during the trial was not even introduced against them. The two defendants were prepared to defend vigorously the allegations that were made against them in an effort to demonstrate their adherence to professional standards and the reasonableness and full disclosure associated with their estimates.

The firms attribute their decisions to settle to the uncertainties of damages measurement, inordinate litigation costs, unpredictability of jury reaction and the related potential for devastating consequences. The Court finds the reasons valid. In view of the conclusions reached in connection with its assessment of other pertinent *Officers for Justice* factors, and the absence of any specific objections, the Court regards the settlement of Plaintiffs' claims against these two firms as fair, reasonable and adequate in accordance with Fed.R.Civ.P. 23.

BLYTH EASTMAN

Blyth Eastman Paine Webber ("Blyth"), financial advisor to the Supply System from 1972 until May, 1981, reached an agreement to settle Plaintiffs' claims against it on December 21, 1988. The terms of the settlement between Plaintiffs and this last defendant are set forth in the Amended Stipulation and Agreement of Compromise and Settlement Between Class Plaintiffs and Blyth Eastman Paine Webber Incorporated, filed on April 12, 1989. Under the terms of its agreement Blyth will pay $20 million, plus interest after January 15, 1989, into an escrow account.

Plaintiffs' claims against Blyth concern allegations that this defendant failed to provide full disclosure of information about the alleged "saturation" of the municipal bond market and to ensure the accuracy of other matters represented in the Official Statements. Chemical Bank did not sue this defendant.

During the period in which Blyth was advising the Supply System concerning the acquisition of construction funds for Projects 4/5, financial markets experienced some of the most volatile conditions ever encountered and the nuclear power industry underwent intense scrutiny. These circumstances, and the legal theories and restraints they implicate, posed significant impediments to Plaintiffs' claims. Similarly, the relevant law concerning Blyth's duty to investors in areas outside its own expertise did not, in many respects, contain a great deal of promise for Plaintiffs. Proving reckless or intentional deceit would have been difficult, and Blyth intended to counter charges of negligence by maintaining, with appropriate evidence, that its performance had been conscientious and forthright.

The Court's comments regarding potential legal limits on the amount of damages available, had Plaintiffs succeeded after a trial, are fully applicable to Blyth, as they have been to all defendants. Furthermore, the cost to Plaintiffs of continuing the trial against this lone remaining defendant could well have offset any gains that might have been reaped through its continuation. The settlement sum is entirely adequate, and the unopposed settlement of these claims is, in the views of experienced counsel, the Settlement Master, and the Court, fair and reasonable in accordance with the mandate of Fed.R.Civ.P. 23.

ERNST & WHINNEY

Class Plaintiffs also maintain a separate class action lawsuit against the accounting firm of Ernst & Whinney ("E & W"), entitled *Mirotznik v. Ernst & Whinney*, CV No. C85–1105, in federal court in Seattle, Washington. The parties to that action agreed to settle the claims therein on February 4, 1989, and the case was consolidated with MDL 551 for settlement purposes.

The terms of the settlement agreement between Class Plaintiffs and this defendant are contained in the Stipulation and Agreement of Compromise and Settlement Between Class Plaintiffs and Ernst & Whinney, filed with this Court on April 17, 1989. The settlement requires payment by E & W of $6.5 million.

The Court has concluded that the settlement of the Ernst and Whinney action meets the criteria of fairness, reasonableness and adequacy mandated by Fed.R. Civ.P. 23 and has today approved it in a

separate Opinion and Order under the caption of that action.

## OBJECTIONS OF POST–JUNE 15, 1983 BOND PURCHASERS

In its foregoing discussion of these settlements, the Court has alluded to a group of objecting Bondholders referred to as "the Heerey Objectors." This group of individuals and entities (including customers and affiliates) currently holds in excess of twenty percent of outstanding Project 4/5 bonds. For the most part, the bonds were purchased after June 15, 1983.

The group filed objections pursuant to this Court's stated intent to hear from all persons who wished to raise objections at the settlement hearing in Seattle. Similar objections were also submitted on behalf of other Bondholders who acquired bonds after June 15, 1983.[30] To the extent not addressed in connection with individual settlements, any substance of those objections is considered, along with the unresolved Heerey objections, in this section.

These Bondholders are *not* Class Members. The close of the Post-termination Class period is the outer boundary encompassing the Class. The boundary date— June 15, 1983—marks the day the Washington Supreme Court effectively informed the world that the Participants' guarantee that they would repay investors was worthless. Investors who purchased 4/5 bonds *after* that day did so with knowledge that there was no "guaranteed" source for payment of the principal and interest on the bonds. These objectors, whose purchases were therefore more speculative than those made before that unforeseen decision, are such investors.[31]

As Bond Fund Trustee, Chemical Bank represented the interests of all Bondholders—those who purchased before June 15, 1983 and those who purchased after June 15, 1983. Throughout this litigation, Chemical has advanced the interests of the entire group. The operative Second Amended Complaint of Chemical Bank contains a number of distinct claims. Had favorable rulings been made in this litigation, each could have provided means of recovery to Bondholders.

Chemical alleged that holders of bonds were injured, as a result of misrepresentations, under Washington state and federal securities laws and under the common law. It stated a separate claim against the Supply System for a judgment for the amount of principal and interest due on the bonds or, in the alternative, for restitution and interest. It claimed that the Supply System was the "alter ego" of its members, and that those Members were thereby liable for the obligations of the Supply System. All of these claims were alleged on behalf of *all* Bondholders.[32]

In December 1987, this Court dismissed federal and state claims of Bondholders that were based upon a theory that bond purchasers receive an automatic assignment of tort claims held by predecessor Bondholders. The Court found that post-June 15, 1983 bond purchasers did not automatically obtain their predecessors' causes of action, if any. The Court said then that "such rights belong to persons who have been harmed by the misconduct of others. They do not accompany securities as they move from holder to holder, but remain with the ones who claim injury." Order of December 22, 1987, at 3; *See In re Nucorp Securities Litigation*, 772 F.2d 1486, 1490 (9th Cir.1985.) A motion for reconsideration of this ruling was filed by the law firm of Patterson, Belknap, Webb & Tyler, retained by Chemical Bank after the decision was rendered to represent it with respect to the interests of WPPSS 4/5 Bondholders who purchased bonds after June 15, 1983. The Court declined to reconsider its ruling. In February 1988, the Court dismissed con-

---

**30.** Separate objecting papers were filed on behalf of bondholders Martin H. Philip and Robert Kleiner; Nathaniel I. Grey and Bernard A. Heerey; and the Bond Investors Association, Inc., by C. Richard Lehmann, President.

**31.** Such persons may also possess bonds acquired prior to June 15, 1983. These comments do not address the holders of such bonds to the extent of those acquisitions.

**32.** Chemical also sought to assert claims that had already been rejected by the Washington Supreme Court, on the grounds that the decisions of that court denied the Trustee's due process rights.

tract and securities-based "alter ego" claims of both Chemical Bank and Class Plaintiffs. Order of February 18, 1988.

The effect of these decisions was to eliminate significant bases for the claims of Bondholders who purchased bonds after June 15, 1983. The record shows, and the Court readily acknowledges, that Chemical Bank vigorously opposed that result, both before and after it was reached.

The remaining claim of these Bondholders, shared by those who purchased before June 15, 1983, was the Trustee's claim against the Supply System for a judgment on the bonds or for restitution and interest. That claim was resolved as part of the Supply System settlement with the System's consent to entry of a judgment on the contract claims of Bondholders.

The Heerey Objectors now contend that Chemical Bank did not act effectively to protect and advance their interests. The thrust of the group's objections, which arise because of adverse decisions in this litigation, is that this Court cannot and should not issue the injunctions provided for in these settlement agreements. These injunctions would be, by their own terms, binding on these objecting Bondholders, who are not Class Members. They would prevent litigation based on the subject matter of the claims resolved in the MDL settlements against the settling parties.

In support of their contention that the Court *cannot* issue the injunctions, the Heerey Objectors argue that they are non-parties, that the Court lacks jurisdiction over them and that it cannot therefore render the proposed orders barring and enjoining further prosecution of the claims litigated herein. In support of their contention that the Court *should not* issue the injunctions, these objectors argue a number of different things, most significantly that they have been inadequately represented throughout the proceedings by Chemical Bank and that the Bank lacks authority to settle these claims. The Court begins with the challenge to its authority to render the proposed orders.

■ The Federal Rules of Civil Procedure limit the binding effect of an injunction to "the parties to the action, their officers, agents, servants, employees, and attorneys and ... those persons in active concert or participation with them who receive actual notice of the order...." Fed. R.Civ.P. 65(d). The Heerey Objectors maintain that Bondholders who acquired bonds after June 15, 1983 are neither "parties" nor "persons before the Court," insofar as such bond holdings are concerned, and thus cannot be bound by the terms of these settlements that require the Court's rendition of judgments that foreclose future claims. They contend that the Court should refuse to render such judgments.

This contention disregards the fact that Chemical Bank, in its representation of all Bondholders, has embodied their legal identity and advocated their interests throughout this litigation. That advocacy did not cease when the Court made the rulings dismissing the claims referred to above. Nor did it cease when Chemical obtained a consent judgment on its contract claim against the Supply System.[33] These Bondholders may not be "parties" in the classic sense; however, they have been represented by a party with their legal identity and interests. As such, they may, and should, be bound by the Court's decisions in this action.

Section 41(1) of the Restatement (Second) of Judgments states that "a person who is not a party to an action but who is represented by a party is bound by and entitled to the benefits of a judgment as though he were a party." Under subsection (a) of

---

**33.** Indeed, Chemical continues to urge Bondholders' interests. In its papers in support of these settlements, Chemical has referred to several bases upon which it will seek allocation of settlement proceeds on behalf of Bondholders. These matters are not ripe for the Court's consideration at this time, although the Court has maintained awareness of the impending allocation issues throughout its appraisal of these settlements. Just as it did not perceive the issues to pose an impediment to its determination of the fairness, adequacy and reasonableness of the settlements to the Classes, it does not believe they compel any reservations in regard to its assessment of the representation by Chemical Bank of the Bondholders. Nor does the fact that the issues remain to be decided suggest that the allocation will be anything but fair.

Section 41(1), a person is deemed to be represented by a party "who is the trustee of an estate or interest of which the person is a beneficiary." Chemical Bank has represented all Bondholders in this litigation. It has capably done so. The Bondholders' present objections to this Court's rendition of the proposed judgments and to the binding effect they are intended to have do not serve to alter those circumstances. *See also Kersh Lake Drainage District v. Johnson,* 309 U.S. 485, 60 S.Ct. 640, 84 L.Ed. 881 (1940); *Southwest Airlines Co. v. Texas International Airlines, Inc.,* 546 F.2d 84, 96 (5th Cir.1977); *United States v. Truckee–Carson Irrigation District,* 649 F.2d 1286, 1303 (9th Cir.1981), *modified on other grounds,* 666 F.2d 351 (9th Cir.1982), *aff'd in part and rev'd in part,* 463 U.S. 110, 103 S.Ct. 2906, 77 L.Ed.2d 509 (1983).

None of the exceptions to the rule stated in Section 41(1)(a) of the Restatement (Second) of Judgments mandates a contrary conclusion. Section 42(1) specifies those exceptions:

A person is not bound by a judgment for or against a party who purports to represent him if:

(a) Notice concerning the representation was required to be given to the represented person, or others who might act to protect his interest, and there was no substantial compliance with the requirement; or

(b) The subject matter of the action was not within the interests of the represented person that the party is responsible for protecting; or

(c) Before rendition of the judgment the party was divested of representative authority with respect to the matters as to which the judgment is subsequently invoked; or

(d) With respect to the representative of a class, there was such a substantial divergence of interest between him and the members of the class, or a group within the class, that he could not fairly represent them with respect

to the matters as to which the judgment is subsequently invoked; or

(e) The representative failed to prosecute or defend the action with due diligence and reasonable prudence, and the opposing party was on notice of acts making that failure apparent.

Chemical has kept Bondholders advised of the progress of this litigation. It prepared and distributed a specific notice that informed them of the settlements, the proposed judgments and of their inclusion of provisions barring and enjoining Class Members and Bondholders from "prosecuting against the settling defendants any claims or actions arising out of or in any way relating to the allegations contained in the complaints or the subject matter of M.D.L. 551." Chemical Bank Notice of Settlements and Settlement Hearing in M.D.L. 551 (All Cases), February 1989, at 1. The Notice also advised that, if approved, the settlements would be binding upon all Bondholders, including their successors and assigns. *Id.*

It is indisputable that the subject matter of this action was, and is, within the interests of these objectors. Chemical Bank was authorized under the § 11.4 of the Bond Resolution [34] to represent all Bondholders as their trustee and attorney-in-fact in prosecuting the claims it alleged on their behalf. The Court has consistently so held. Chemical has not been divested of that authority. Further, although Chemical is not a "Class" representative, there has been no "substantial divergence of interest" between the Bank and the Bondholders *or* between the Bank and the objecting non-Class Member Bondholders.[35] The pursuits of Chemical were unwaveringly directed towards the achievement of an ample recovery from defendants in this action. Its representation of Bondholders was, at all times, fair, diligent and prudent in the mind of the Court and, presumably, of all parties.

---

**34.** Supply System Board of Directors Bond Resolution No. 890, adopted February 23, 1977.

**35.** Nor does the Court perceive that any divergence of interest between these two sub-groups

of Bondholders that may have developed during the litigation altered, to any degree, the Bank's zealous pursuits.

In sum, nothing has been advanced in the briefs, in oral argument, or in the letters subsequently sent to the Court by counsel for these objectors, that defeats this Court's power under Rule 65(d) to order barred and enjoined the further prosecution against the settling defendants of any claims or actions arising out of or in any way relating to the allegations contained in the complaints or the subject matter of M.D.L. 551.

Similar challenges to the Court's authority under the Anti–Injunction Act, 28 U.S.C. § 2283, also fail. As the Act itself provides, a federal court's injunction of proceedings in a State court are appropriate where, as here, they are "necessary to protect or effectuate its judgments." To dispute the necessity of foreclosing proceedings, as these settlements and this Court's proposed order are intended to do, is unavailing.

 The Heerey Objectors also challenge the authority of Chemical Bank. They claim that provisions of the Bond Resolution prohibit Chemical from entering into these settlements without the consent of Bondholders. The Court, however, does not read the cited provisions as preventing Chemical Bank from arriving at settlement agreements that compromise Bondholder claims in this litigation. Section 11.5 of the Bond Resolution has not been violated by these settlements, which include a consent judgment by the Supply System on the Bonds.[36] The restriction in Section 11.4 on the Trustee's "right to accept or consent to any plan of reorganization or compromise or otherwise take any action of any character ... to waive or change in any way any right of any [Bondholder]", by the section's own terms, applies in "equity, receivership, insolvency, bankruptcy, liquidation, readjustment, reorganization or other similar

proceedings relative to the [Supply] System." This litigation is not such a proceeding and it is the Court's belief that the provisions were clearly not intended to apply outside the specified types of actions. On the contrary, the Court finds that Chemical Bank reasonably and prudently exercised the discretion and authority vested in it by § 11.4 of the Bond Resolution in its diligent representation of all Bondholders and in reaching these settlements.

The Heerey Objectors also claim that preliminary settlement documents, and in some cases the final agreements themselves, contain terms that are more favorable to Bondholders than those ultimately incorporated into the proposed terms of orders and final agreements. They contend that the terms of the earlier documents would not have precluded Bondholders from bringing these settled claims. They pose these objections now, presumably as a result of Chemical Bank's disclosure in its Notice of Settlements to Bondholders that the Court's approval of any of these settlements would result in the entry of a judgment that would, among other things, include determinations that are antithetic to the objectors' asserted understanding of the language of pertinent documents.[37]

The objectors misconstrue the content of the various documents. The intent of the parties to the settlement agreements, as well as the proper reading of the language of the memoranda and final agreements *do* restrict all Bondholders, regardless of whether they are also Class Members, from bringing similar suits. The notice provided by Chemical Bank in February, 1989, of the proposed orders properly captures the content and intent of those agreements. The Court does not agree that there are incon-

---

**36.** Section 11.5 provides in part: "Nothing in the Resolution or in the Bonds or in the coupons contained shall affect or impair the obligation of the System, which is absolute and unconditional, to pay at the respective dates of maturity ... the principal of and interest on the Bonds ..., or affect or impair the rights of action, which are also absolute and unconditional, of any holder to enforce the payment of his Bonds, or to reduce to judgment his claim against the System for the payment of the prin-

cipal and interest on his Bonds, without reference to, or consent of, the Bond Fund Trustee or any other holder of Bonds."

**37.** Most of the disagreements appear to stem from incorrect interpretations of definitional terms. Although the Court recognizes that the definitions are sometimes somewhat intricate, a careful reading of the agreements in which they appear, or of incorporated provisions, reveals the errors.

sistencies between or among the preliminary agreements, final agreements and/or the proposed orders relating to the enumerated settlements that would vary the scope of persons to whom dismissals, releases and anti-suit orders apply. While the final settlement agreements are almost invariably more detailed than the preliminary memoranda, the intent of the parties to the agreements is consistently reflected in them. The proposed orders simply further this intent.

In any event, and regardless of the cause of the professed misinterpretations, the settlement agreements, the orders that have been proposed, and the Orders that accompany this opinion are intended precisely to put to rest this litigation and to secure the total peace that these defendants are entitled to as part of the compromises that were reached between them and the Plaintiffs—*all* of the plaintiffs—represented in this action.

It is hereby ORDERED that JUDGMENT be entered in accordance with the foregoing Opinion and Order.